

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-12-1996

# Artway v. New Jersey Atty Gen

Precedential or Non-Precedential:

Docket 95-5157,95-5194,95-5195

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Artway v. New Jersey Atty Gen" (1996). *1996 Decisions.* Paper 195.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/195

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NOS. 95-5157, 95-5194, 95-5195

_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF THE NEW JERSEY STATE POLICE

Attorney General of New Jersey and Superintendent
of the New Jersey State Police, Appellants in No. 95-5157

_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF NEW JERSEY STATE POLICE

Chief of Police of Woodbridge Township, New Jersey
Appellant in No. 95-5194

_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF NEW JERSEY STATE POLICE

Alexander A. Artway, Appellant in No. 95-5195

(Civ. No. 94-cv-06287)

2

_____

On Appeal From the United States District Court
For the District of New Jersey
_____

Argued: October 17, 1995

Present: BECKER, ROTH, Circuit Judges, and
SHADUR, District Judge *
(Opinion Filed: April 12, l996)

DEBORAH T. PORITZ, ESQUIRE (ARGUED)
Attorney General Of New Jersey
JOSEPH L. YANNOTTI, ESQUIRE
Assistant Attorney General
RHONDA S. BERLINER-GOLD, ESQUIRE
LARRY ETZWEILER, ESQUIRE
B. STEPHAN FINKEL, ESQUIRE
Deputy Attorneys General

Richard J. Hughes Justice Complex
CN112
Trenton, NJ  08625

Attorneys for Attorney General of New Jersey
Appellant in No. 95-5157

NEAL H. FLASTER, ESQUIRE (ARGUED)
RICHARD L. RUDIN, ESQUIRE
WEINER LESNIAK, ESQUIRE
JEREMY G. WEISS, ESQUIRE
299 Cherry Hill Road
Parsippany, NJ  07054

Attorneys for the Chief of Police of Woodbridge
Township, New Jersey, Appellant in No. 95-5194

FAITH HOCHBERG, ESQUIRE (ARGUED)
United States Attorney
STUART RABNER, ESQUIRE
GEORGE S. LEONE, ESQUIRE
Assistant United States Attorneys
970 Broad Street, Room 502

Newark, NJ  07102

FRANK W. HUNGER, ESQUIRE
Assistant Attorney General
LEONARD SCHAITMAN, ESQUIRE
WENDY M. KEATS, ESQUIRE
Attorneys, Appellate Staff
United States Department of Justice
Civil Division, Room 3127
10th & Pennsylvania Avenue, N.W.
Washington, DC  20530-0001

_____

\* Hon. Milton I. Shadur, United States District Judge for the Northern District of
Illinois, sitting by designation.

Attorneys for United States of America,
Amicus-Appellant in No. 95-5157

GEOFFREY S. BERMAN, ESQUIRE
Mudge, Rose, Guthrie, Alexander & Ferdon
180 Maiden Lane
New York, New York  10038

Attorney for Maureen Kanka, Richard Kanka, Dick Zimmer,
Randall Cunningham, Nathan Deal, Jennifer Dunn, Tillie Fowler,
Thomas Manton, Susan Molinari, Jim Saxton, Christopher Smith,
Amicus-Appellants in No. 95-5157

JOHN J. GIBBONS, ESQUIRE (ARGUED)
LAWRENCE S. LUSTBERG, ESQUIRE
JONATHAN ROMBERG, ESQUIRE
CHRISTOPHER WALSH, ESQUIRE
Crummy, Del Deo, Dolan, Griffinger & Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, NJ  07102-5497

Attorneys for Alexander A. Artway,
Appellant in No. 95-5195

RONALD K. CHEN, ESQUIRE (ARGUED)
Rutgers Constitutional Litigation Clinic
Rutgers University School of Law

15 Washington Street
Newark, NJ  07102

Attorney for American Civil Liberties Union
of New Jersey, Amicus-Appellant in No. 95-5195

GLENN R. PAULSEN, ESQUIRE
Capehart & Scatchard, P.A.
A Professional Corporation
142 West State Street
Trenton, NJ  08608

Attorney for the New Jersey Senate,
Amicus-Appellant in No. 95-5157

DENNIS C. VACCO, ESQUIRE
Attorney General of the State of New York
VICTORIA A. GRAFFEO, ESQUIRE
Solicitor General
PETER H. SCHIFF, ESQUIRE
Deputy Solicitor General
ANDREA OSER, ESQUIRE
Assistant Attorney General
New York State Department of Law
The Capitol
Albany, NY  12224

Attorneys for the State of New York,
Amicus-Appellant in No. 95-5157


OPINION OF THE COURT


TABLE OF CONTENTS

I.    BACKGROUND FACTS  9

II.   PROCEDURAL HISTORY 14


4

III.  MOOTNESS 16

IV.   RIPENESS 19
      A.  Introduction 19
B.  The Ex Post Facto, Bill of Attainder,
                    and Double Jeopardy Challe
      1.    Hardship of Denying Review 21
      2.    Fitness of Issues for Judicial Review 25
            C.  Due Process Claims 30
      1.    Burden of Persuasion 30
            2.    Notice 33
      D.  Summary of Unripe Claims 34

V.    REGISTRATION 35
A.  "Punishment" Under the Ex Post Facto,    Bill of Attainder,
            and Double    Jeopardy Clauses 35
      1.    De Veau v. Braisted: Subjective Purpose 38
      2.    United States v. Halper: Objective Purpose through
                    Proportionality 38
      3.    Austin v. United States: Objective Purpose through
                    History 44
      4.    Department of Revenue v. Kurth Ranch:  Objective
                    Purpose and Deterrence 49
      5.    California Department of Corrections v. Morales: Effect
                    53
      6.    Kennedy v. Mendoza-Martinez: The Inquiry for the Nature
                    of Proceedings 57
      B.  Synthesizing the Jurisprudence: The    Test(s) 60
      C.  The Registration Provisions of Megan's Law Evaluated 62
      1.    Actual Purpose 63
      2.    Objective Purpose 64
      3.    Effects 69
            D.  Summary of Registration Claims 71

VI.   EQUAL PROTECTION 71

VII.  DUE PROCESS 74

VIII. UNCONSTITUTIONAL VAGUENESS 76

IX.   PULLMAN ABSTENTION 79

X.    CONCLUSION 82

BECKER, <u>Circuit Judge</u>.

Alexander Artway thought that he had paid his debt to society by serving

seventeen years in jail for a sex offense. After he was released, Artway settled in

community, secured employment, and married.  Then, on October 31, 1994, New Jersey

Megan's Law.  The Law requires certain sex offenders --including those like Artway

at sentencing to be "repetitive and compulsive" -- to register with local law enfor

It also requires community notification for registrants deemed a future risk.  Artw

sought an injunction against the enforcement of Megan's Law pursuant to 28 U.S.C. §

and 42 U.S.C. § 1983, arguing that it punishes him, unconstitutionally, a second ti

also alleged that the Law provides insufficient procedural protections.

After summary proceedings in which no evidence was heard and virtually no

factual record developed, the District Court for the District of New Jersey held th

notification aspects of Megan's Law violated the Ex Post Facto Clause of the Unite

Constitution and enjoined their enforcement against Artway.  The court upheld the

constitutionality of the Law's registration component.  Both sides appealed.

These cross appeals present numerous questions (some of which are quite

difficult):  (1) Do the registration and notification provisions of Megan's Law con

"punishment" within the meaning of the Ex Post Facto, Bill of Attainder, and Double

Jeopardy Clauses of the U.S. Constitution? (2) Is Megan's Law unconstitutionally va

(3) Does Megan's Law violate equal protection or due process? (4) Are any or all of

Artway's claims unripe or moot? and (5) Was the district court's decision not to ab

under <u>Railroad Commission v. Pullman Co.</u>, 312 U.S. 496 (1941), proper?

6

Timing is important not only to punishment, but also to proper judicial decisionmaking. Although we reject the State's contention that Artway's claims are [...] because he has moved from New Jersey, ripeness problems preclude us from reaching t[...] lion's share of Artway's claims. First, Artway's claims that Megan's Law's notific[...] provisions violate the Ex Post Facto, Bill of Attainder, and Double Jeopardy Clause[...] unripe. Sex offenders are subject to notification only if the prosecutor finds a [...] significant risk of recidivism -- a determination that, with respect to Artway, has [...] yet been made and cannot be easily forecasted. It is far from clear, therefore, th[...] Artway will ever be subject to notification. Moreover, we cannot make the novel, [...] difficult, and fact-sensitive determination whether the notification provisions con[...] "punishment" -- the central question under all three clauses -- without a record of [...] notification will be implemented and what concrete effects it will have on Artway [...] those similarly situated). Although Artway's contention that notification constitu[...] punishment is <u>prima</u> <u>facie</u> quite persuasive, the claim will be fit for judicial revi[...] when Artway (or some other sex offender) submits to the notification process and th[...] impact is chronicled in the record. Similarly, since Artway has not yet been class[...] under Megan's Law, his claim that he is due more process for receiving notice of an[...] challenging a hypothetical determination regarding his dangerousness is unripe.

With regard to Artway's claims that are currently justiciable, we hold fi[...] that Megan's Law's registration component does not violate the Ex Post Facto, Doubl[...] Jeopardy, or Bill of Attainder Clauses as impermissible "punishment." As the follo[...] discussion will show, the law on "punishment" is complicated and in some disarray.

7

devote a significant portion of this opinion, therefore, to explaining and synthesi

caselaw on the "punishment" issue in order to formulate the correct legal test.

We also hold that (1) the "repetitive and compulsive" classification of M

Law does not offend equal protection; (2) the alleged unreliability and unfairness

Artway's "repetitive and compulsive" determination does not violate due process; (3

Megan's Law is not unconstitutionally vague as applied to him; and (4) the district

did not err in refusing to abstain under Pullman.

We therefore vacate the judgment of the district court insofar as it enjo

enforcement of Tier 2 and Tier 3 notification under Megan's Law, and affirm that ju

insofar as it holds the registration provisions (including Tier 1 notification) of

constitutional.


## I.   BACKGROUND FACTS

In 1971, a New Jersey jury convicted Artway of sodomy. The statutory elem

Artway's crime did not require force, but the judge found that he had used violence

as a result, sentenced him to an indefinite term in prison. See Artway v. Pallone,

F.2d 1168, 1170-71 & n.3 (3d Cir. 1982).[0]  In addition, based in part on a prior st

rape conviction, the judge made a finding for sentencing purposes that Artway's con

was "characterized by a pattern of repetitive, compulsive behavior." See id. Afte

serving seventeen years of the sentence, Artway was released in 1992 (he had been a

fugitive from 1971 to 1975).

---

[0]The victim testified that Artway and two friends took her to a wooded area, stripp
tied her to a tree, urinated on her, forced her to pose nude for photographs, and
sodomized her for over an hour. See id.

In 1994, the New Jersey legislature enacted Megan's Law –– formally the New Jersey's Sexual Offender Registration Act, Pub. L. 1994, Chs. 128, 133 (codified at N.J.S.A. 2C:7-1 to 7-11) –– in response to public outcry following the brutal rape and murder of a seven-year-old girl, Megan Kanka. Megan, her parents, and the community did not know that the murderer, who lived across the street from the Kankas, was a twice-convicted sex offender. The legislation was rushed to the floor as an emergency measure, skipping the committee process, and was debated only on the floor; no member voted against it.

Megan's Law enacts a registration requirement and three tiers of notification. The registration provision requires all persons who complete a sentence for certain designated crimes involving sexual assault after Megan's Law was enacted to register with local law enforcement. N.J.S.A. 2C:7-2b(1). Those committing these offenses and completing all incarceration, probation, and parole before the Law's enactment must register only if, at the time of sentencing, their conduct was found to be "characterized by a pattern of repetitive and compulsive behavior." N.J.S.A. 2C:7-2b(1).

The registrant must provide the following information to the chief law enforcement officer of the municipality in which he resides: name, social security number, age, race, sex, date of birth, height, weight, hair and eye color, address of legal residence, address of any current temporary legal residence, and date and place of employment. N.J.S.A. 2C:7-4b(1). He must confirm his address every ninety days, notify the municipal law enforcement agency if he moves, and re-register with the law enforcement agency of any new municipality. N.J.S.A. 2C:7-2d to e.

9

The registration agency then forwards the registrant's information, as we[ll as] any additional information it may have, to the prosecutor of the county that prosec[uted] the registrant. N.J.S.A. 2C:7-4c to d.  The prosecutor, in turn, forwards the infor[mation] to the Division of State Police, which incorporates it into a central registry and [then] notifies the prosecutor of the county in which the registrant plans to reside.  Id. [This] information is available to law enforcement agencies of New Jersey, other states, a[nd the] United States.  N.J.S.A. 2C:7-5. The registration information is not open to public inspection. Law enforcement agencies are authorized to release "relevant and necess[ary]" information concerning registrants when . . . necessary for public protection," but [only] in accordance with the notification procedures we describe below.  Failure of the s[ex] offender to comply with registration is a fourth-degree crime. N.J.S.A. 2C:7-5.

At this stage, the notification provisions are triggered.  The prosecuto[r of the] county in which the registrant plans to live must consider the information provided through registration and, in consultation with the prosecutor of the convicting cou[nty,] determine whether the registrant poses a low, moderate, or high risk of re-offense. N.J.S.A. 2C:7-8d(1).  In making that determination, the prosecutor must consider guidelines the Attorney General has promulgated pursuant to the Act.  N.J.S.A. 2C:[7-8] b.

The determination of risk as low, moderate, or high places the registrant [in] corresponding notification categories: Tier 1, Tier 2, or Tier 3.  Under Tier 1 (lo[w] risk), the prosecutor must notify law enforcement agencies likely to encounter the registrant.  N.J.S.A. 2C:7-8c(1).  Under Tier 2 (moderate risk), the prosecutor, wo[rking] with local law enforcement agencies, must notify schools, licensed day care centers[,]

10

summer camps, and designated community organizations involved in the care of childr

the support of battered women or rape victims.  N.J.S.A. 2C:7-8c(2).  Under Tier 3

risk), law enforcement agencies are required to notify members of the public likely

encounter the registrant.  N.J.S.A. 2C:7-8c(3).

The prosecutor makes this future risk determination using the "Registrant

Assessment Scale," promulgated by the Attorney General.  See Registration and Commu

Notification Bench Manual 26.  The Scale is a matrix of thirteen categories organiz

four larger headings:  (1) Seriousness of Offense; (2) Offense History; (3)

Characteristics of the Offender; and (4) Community Support.  Id.[0]  The prosecutor s

each of these categories for different levels of risk -- low, moderate, or high.  I

doing so, he or she is guided by commentary that includes factual examples.  Id. at

This initial risk score is multiplied by coefficients that differ by category, and

data is tabulated for a final risk assessment score.  Id. at 26.  Finally, the pros

must consider whether two exceptions apply.  "If an offender has indicated that he

reoffend if released into the community and the available record reveals credible e

to support this finding, then the offender will be deemed a high risk . . . ."  Id.

Conversely, "if the offender demonstrates a physical condition that minimizes the r

reoffense, then the offender will be deemed to be a low risk."  Id.

The form of notification under Tiers 2 and 3 includes the registrant's na

recent photograph, his physical description, offense, address, place of employment

_____

[0]The complete list of categories is as follows:  (1) Degree of Force; (2) Degree of
Contact; (3) Age of Victim; (4) Victim Selection; (5) Number of Offenses/Victims;
Duration of Offensive Behavior; (7) Length of Time Since Last Offense; (8) History
Anti-Social Acts; (9) Response to Treatment; (10) Substance Abuse; (11) Therapeutic
Support; (12) Residential Support; and (13) Employment/Educational Stability.  Id.

11

schooling, and a description and license plate number of the registrant's vehicle.

39. Those notified under Tier 2 are informed that the information is not to be sha[red]

with the general public, and every notification must contain a warning about the cr[iminal]

consequences of vandalism, threats and assaults against the registrant or any of hi[s]

associates. Id. at 40.

The New Jersey Supreme Court, in upholding the constitutionality of Megan['s Law]

in Doe v. Poritz, 142 N.J. 1 (1995), read the following additional procedural prote[ctions]

into the statute. First, Tier 2 notice must be confined to those likely to encount[er the]

registrant. Id. at 29. Second, the prosecutor must give the registrant notice, unl[ess]

"impossible as a practical matter," before any Tier 2 or 3 notification. Id. at 30[.]

Third, a court must provide an opportunity for a judicial hearing, in camera, in wh[ich the]

registrant bears the burden of persuasion. Id. at 31–32.

Because every registrant is classified at a minimum under Tier 1, this lo[west]

level of notification accompanies every registration. Tier 1 requires notice only [to law]

enforcement, whereas Tier 2 and Tier 3 both result in notice to the community.

Consequently, for purposes of the subsequent discussion, "registration" will inclu[de]

registration and Tier 1 notification, while "notification" will refer to Tier 2 and [Tier 3]

notification.

## II.    PROCEDURAL HISTORY

Artway sought declaratory relief, pursuant to 28 U.S.C. § 2201 and 42 U.S[.C. §]

1983, alleging that enforcement of Megan's Law against him would violate his feder[al]

constitutional rights, including equal protection, due process, and the right not t[o]

12

punished in violation of the Ex Post Facto, Bill of Attainder, and Double Jeopardy

Clauses.  The district court decided the case in the most summary fashion.  After t

State moved to dismiss Artway's motion for injunctive relief, Artway urged the dist

court to construe his original motion as one for summary judgment.  The court oblig

allowed no discovery, heard no testimony, and made no findings of fact.  Instead, i

as a matter of law on all the complex issues pending before it.

The court opened its opinion by brushing aside a ripeness challenge to Ar

claims.  The court then held that the registration component of Megan's Law was

constitutional, but that Tier 2 and Tier 3 notification violated the Ex Post Facto

In doing so, it treated this case as an abstract issue of law.  The court recited c

on the Ex Post Facto, Cruel and Unusual Punishment, Bill of Attainder, and Double J

Clauses.  It also invoked state court cases, and, as might be expected, it discusse

Scarlet Letter.[0]  The resulting record contains only one piece of information descr

the indirect effects of Megan's Law on Artway:  a copy of a Guardian Angel flier

distributed in Artway's community warning people to "BEWARE."[0]

But even that evidence is not discussed in the district court's opinion.

Instead, the court asserted that the registration component of Megan's Law is

constitutional "for the reasons expressed in Arizona v. Noble, [829 P.2d 1217 (Ariz

1992)]."  Artway v. Attorney General, 876 F. Supp. 666, 688 (D.N.J. 1995).  It ther

invalidated the notification provisions of Megan's Law using the seven-factor test

---

[0]It also included To Kill a Mockingbird and Plato's Dialogues in its discussion of
constitutes "punishment."

[0]Because Artway has never submitted to even the registration provisions of Megan's
the flier is not the result of notification.  Rather, Artway's notoriety seems to h
flowed from this litigation.

13

punishment of <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168-69 (1963). The court

enjoined New Jersey, at first preliminarily and then permanently, from enforcing th

notification provisions of Megan's Law. It did not reach Artway's other arguments,

as the Due Process and Equal Protection challenges he presses before this Court.

Artway appeals the district court's ruling that registration and Tier 1

notification are constitutional, and presses his Due Process and Equal Protection

arguments should this Court find Tier 2 and Tier 3 constitutional. The State appea

district court's holding that Tier 2 and Tier 3 are unconstitutional. At this junc

these issues all present legal questions, subject to plenary review.[0] <u>See</u> <u>American</u>

<u>Medical Imaging Corp. v. St. Paul Fire & Marine Ins. Co.</u>, 949 F.2d 690, 692 (3d Cir

1991).

## III. MOOTNESS

As a threshold matter, we reject the State's assertions that Artway's app

moot because he has moved out of New Jersey. Artway no longer has a live claim, th

argues, because his move from New Jersey voided his duty to register. The State poi

to <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), in which the Supreme Court

that environmentalists did not have injury in fact because they could not show any

concrete evidence, such as a plane ticket, of their intent to return to the foreig

country where the challenged environmental action would take place. Like the

---

[0] One aspect of the propriety of <u>Pullman</u> abstention -- i.e., as to the question of
disruption of important state policies -- is reviewed for abuse of discretion. <u>See</u>
<u>Biegenwald v. Fauver</u>, 882 F.2d 748, 750-51 (3d Cir. 1989). However, this distincti
plays no part in our analysis. <u>See</u> <u>infra</u> note 34 and accompanying text.

14

environmentalists in <u>Lujan</u>, New Jersey argues, Artway's "bald assertion that he int

return to New Jersey . . . rests on conjecture and is entirely hypothetical."

But if the record is clear on nothing else, it shows that Artway's obliga

register is keeping him from returning to New Jersey, and that situation presents a

controversy.  The litigants in <u>Lujan</u> merely opined that they planned to visit the s

a foreign country, "some day" in the future.  504 U.S. at 564 & n.2.  Artway, in co

lived in New Jersey -- where he established a home, a family, and a job -- until Ma

1995.  He left shortly after Megan's Law was passed and has sworn that Megan's Law

keeping him from moving back.  Indeed, he brought this litigation, originally <u>pro s</u>

order to return there.  Artway cannot live in New Jersey without either complying w

Megan's Law, which undoubtedly burdens him, or facing prosecution.  Especially give

constitutional right to move interstate, <u>see</u> <u>Shapiro v. Thompson</u>, 394 U.S. 618 (196

this Hobson's choice constitutes sufficient injury in fact even under <u>Lujan</u>'s stand

analysis.

In addition to being factually different from <u>Lujan</u>, the State's mootness

is legally different from that case. <u>Lujan</u> addressed standing, which inquires wheth

someone is the proper party to bring a law suit at the beginning of the case. Doctr

to satisfy core Article III requirements, standing requires (1) that the plaintiff

injury in fact, (2) that the injury be fairly traceable to the challenged conduct,

that a favorable ruling would redress the injury.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560-61.

Mootness, on the other hand, asks whether a party who has established standing has

lost it because the facts of her case have changed over time.  Thus, the threshold

satisfying the prohibition against mootness is somewhat lower than that for standin

"[T]he central question in mootness inquiries is whether changes in circumstances t[hat]
prevailed at the beginning of the litigation have forestalled any occasion for mean[ingful]
relief."  Huber v. Casablanca Indus., Inc., 916 F.2d 85, 107 (3d Cir. 1990) (intern[al]
quotations omitted), overruled on other grounds by Milwaukee Brewery Workers' Pensi[on]
v. Jos. Schlitz Brewing Co., 115 S. Ct. 981 (1995); accord Zellous v. Broadhead
Associates, 906 F.2d 94, 100 (3d Cir. 1990) ("An action becomes moot when '(1) ther[e is no]
reasonable expectation that the alleged events will recur . . . and (2) interim rel[ief or]
events have completely eradicated the effects of the violation.'") (quoting County [of Los]
Angeles v. Davis, 440 U.S. 625, 631 (1979)).[0]

The opportunity for meaningful relief is still present here.  Artway ceas[ed the]
activity which unquestionably granted him standing -- living in New Jersey -- only [under]
threats of enforcement.  And he has sworn to his desire to return if Megan's Law is
invalidated.  Cf. Begins v. Phillbrook, 513 F.2d 19, 24 (1975) (holding case not mo[ot even]
though plaintiffs sold second automobile on threats of benefit termination when the[y]
demonstrated continuing desire to own two cars).

## IV.    RIPENESS

## A.    Introduction

---

[0]Mootness also contains four major exceptions:  (1) wrongs that have collateral
consequences, see Sibron v. New York, 392 U.S. 40, 53 (1968); (2) wrongs that are c[apable]
of repetition yet evading review, see Roe v. Wade, 410 U.S. 113 (1973); (3) wrongs [that]
are voluntarily ceased but could resume, see United States v. W.T. Grant Co., 345 U[.S. 629]
(1953); and (4) wrongs to a class that continue though those to the named plaintiff[s do]
not, see Sosna v. Iowa, 419 U.S. 393 (1975).  These exceptions are not directly app[licable]
here, but they further demonstrate how mootness doctrine has diverged from standing
doctrine to allow courts to decide real controversies in the face of changing
circumstances.

We next examine the State's assertions that Artway's ex post facto, doub

jeopardy, bill of attainder, and due process challenges are not ripe.  Article III,

part of its "case or controversy" mandate, requires parties to suffer injury or com

immediate danger of suffering an injury before challenging a statute.  See O'Shea v

Littleton, 414 U.S. 488, 494 (1974).  The basic rationale of the ripeness requireme

"to prevent the courts, through the avoidance of premature adjudication, from entar

themselves in abstract disagreements."  Abbott Labs. v. Gardner, 387 U.S. 136, 148

Ripeness prevents courts from interference with legislative enactments until it is

necessary to do so, and enhances the quality of judicial decisionmaking by ensuring

cases present courts an adequate record to permit effective review and decisionmaki

See id.  Ripeness involves weighing two factors:  (1) the hardship to the parties o

withholding court consideration; and (2) the fitness of the issues for judicial rev

See 387 U.S. at 149.[0]

## B.  The Ex Post Facto, Bill of Attainder,
## and Double Jeopardy Challenges

Artway contends that Megan's Law imposes unconstitutional punishment unde

Ex Post Facto, Bill of Attainder, and Double Jeopardy Clauses.  Under the Ex Post F

Clause, the government may not apply a law retroactively that "inflicts a greater

punishment, than the law annexed to the crime, when committed."  Calder v. Bull, 3

---

[0]We have sometimes employed a three-part test for ripeness in the declaratory judgm
context: (1) adversity of interest; (2) conclusivity; (3) utility.  See Step-Saver
Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir. 1990).  However, the S
Court's two-part test is of course still good law, and we continue to use that form
as well.  See, e.g., New Hanover Tp. v. United States Army Corps of Engineers, 992
470 (3d Cir. 1993).  We deem the two-part analysis more apt for this case.

Dall.) 386, 390 (1798).  Under the Bill of Attainder Clause, legislatures are forbi

engage in "[l]egislative acts, no matter what their form, that apply either to name

individuals or to easily ascertainable members of a group in such a way as to infli

punishment on them without a judicial trial."  United States v. Brown, 381 U.S. 437

49 (1965).  Finally, the Double Jeopardy Clause prohibits, inter alia, "a second

prosecution for the same offense after conviction . . . and multiple punishments fo

same offense."  United States v. Halper, 490 U.S. 435, 440 (1989).

The crux of Artway's argument is that Megan's Law imposes unconstitutiona

"punishment."  In analyzing the ripeness of these challenges, we must carefully

distinguish between the registration and notification provisions of Megan's Law.  W

not, however, distinguish among the Ex Post Facto, Bill of Attainder, and Double Je

Clauses; their differences with respect to the requisites of "punishment," if any,

relevant here.


1.        Hardship of Denying Review

The first factor for determining ripeness is the hardship of denying revi

Abbott Labs., 387 U.S. at 149.  The district court considered this factor, but fail

distinguish between the registration and notification aspects of Megan's Law. The h

factor inquires whether the threat of prosecution is "credible," and not merely

"speculative," so as to be concrete for purposes of Article III.  See Babbitt v. Un

Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  Although preenforcement review

exception rather than the rule, "[w]hen the plaintiff has alleged an intention to e

in a course of conduct arguably affected with a constitutional interest, but proscr

18

a statute, and there exists a credible threat of prosecution thereunder, he should

required to await and undergo a criminal prosecution as the sole means of seeking r

Id. (internal quotations omitted); accord Steffel v. Thompson, 415 U.S. 452, 459 (1

("[I]t is not necessary that petitioner first expose himself to actual arrest or

prosecution to be entitled to challenge a statute he claims deters the exercise of

constitutional rights."); Abbott Labs., 387 U.S. at 154 (holding a business's chall

a labeling statute ripe even though the company had not been threatened specificall

prosecution).

This Court has afforded review even when the state has taken no active me

toward prosecution. For example, in Presbytery of Orthodox Presbyterian Church v.

40 F.3d 1454 (3d Cir. 1994), we held that a church pastor's preenforcement challeng

New Jersey's anti-discrimination law was ripe for adjudication when the pastor had

announced his intention to speak against homosexuality even though the government h

actually threatened to prosecute. That the state would not disavow the possibility

prosecution for activities outside the church was enough to make the threat "real a

substantial." Id. at 1468.

On the other hand, "[m]any cases deny ripeness on the straight-forward gr

that the anticipated events and injury are simply too remote and uncertain to justi

present adjudication." 13A Charles A. Wright et al., Federal Practice and Procedur

3532.2, at 138 (1984). A substantial contingency is the classic impediment to a

preenforcement challenge. For example, in New Hanover Tp. v. United States Army Co

Engineers, 992 F.2d 470, 473 (3d Cir. 1993), we held that a challenge to constructi

municipal waste landfill was unripe because the state had not yet granted a necessa

19

water quality certificate.  Although the Army Corps of Engineers had granted anothe

permit that the plaintiffs sought to challenge, we explained, construction of the [

still could not commence: "[T]he effects of the Corps' deciding that [the project]

proceed . . . will not be felt in a concrete way unless and until the [state] grant

project] a water quality certificate."  Id.; see also Acierno v. Mitchell, 6 F.3d 9

975-77 (3d Cir. 1993) (holding challenge to zoning decision unripe when review boar

not yet made final decision); Wilmington Firefighters Local 1590, Int'l Ass'n of

Firefighters v. City of Wilmington, Fire Dept., 824 F.2d 262, 266 (3d Cir. 1987) (h

challenge to yet uncreated promotion lists unripe because they were "purely a matte

conjecture").

Artway urges that both the registration and notification components of Me

Law constitute unconstitutional "punishment" under the Ex Post Facto, Double Jeopar

Bill of Attainder Clauses.  Artway's challenge to the registration provisions of Me

Law satisfies the hardship prong.  Like the petitioners in Babbitt, Steffell, Abbot

and Florio, he faces the decision of complying with a putatively invalid law or suf

prosecution.  Registration presents no contingency for Artway.  If he resides in Ne

Jersey, he must provide certain information to local law enforcement.  And the high

profile of Megan's Law, and Artway's case in particular, virtually assures that Art

will be prosecuted if he engages in his allegedly protected conduct:  returning to

Jersey without registering.  In fact, the Attorney General assured the district cou

oral argument that she would prosecute Artway if he failed to register.  See Artway

Attorney General, 876 F. Supp. 666, 670 n.4 (D.N.J. 1995).  Under these circumstan

20

threat of prosecution Artway faces satisfies any test of the Supreme Court and of t

Court: these threats are credible, real, and substantial.

In sharp contrast, Artway's challenge to the notification provisions of N

Law fails this prong.  Unlike registration, notification involves a crucial conting

only if, after registering, Artway is classified as a moderate or high risk of re-o

will he face notification.  This classification hinges on a New Jersey prosecutor's

decision to be reached after applying the Attorney General's "Registrant Risk Asses

Scale."  See supra pages 12-13.  The State prosecutor, possessing the pertinent

information not present in this record, scores these thirteen categories for differ

levels of risk, employing the corresponding eleven pages of guidelines.  The prosec

then multiplies by differing coefficients, tabulates the data for a risk assessment

and considers whether exceptions apply.

As in New Hanover Township, Acierno, and Wilmington Firefighters, whether

contingency will ever come to pass is a matter of speculation.  We may not pass upo

hypothetical matters.  And Artway faces no hardship from denying review of his

notification challenges at this point.  If he registers, and if the State decides t

situation warrants community notification, he may seek to enjoin that action at tha

Thus, the "hardship" factor alone precludes review of Artway's notification claims.

2.       Fitness of Issues for Judicial Review

---

Similarly, we cannot rule on the claim of the Chief of Police of Woodbridge Townsh
state immunity bars his "potential liability" for a hypothetical § 1983 action seek
damages. Artway has filed no such suit.  To the extent the Police Chief's defense r
to the attorney's fees Artway is seeking, the Eleventh Amendment has no application
award of attorneys fees under 42 U.S.C. § 1988.  See Missouri v. Jenkins, 491 U.S.
(1989).

The second factor for evaluating ripeness, this one never mentioned by th[e] district court, is whether the issues are fit for judicial review. Abbott Labs., [387 U.S.] at 149. In making this determination, we must once again distinguish between the registration component of Megan's Law on the one hand, and the notification provisi[ons on] the other. The principal consideration is whether the record is factually adequate [to] enable the court to make the necessary legal determinations. The more that the que[stion] presented is purely one of law, and the less that additional facts will aid the cou[rt in] its inquiry, the more likely the issue is to be ripe, and vice-versa. Compare Duke [Power] Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 81-82 (1978) ("Although it i[s true] that no nuclear accident has occurred and that such an occurrence would eliminate m[uch of] the existing scientific uncertainty surrounding this subject, it would not, in our [view,] significantly advance our ability to deal with the legal issues presented nor aid u[s in] their resolution.") with Zemel v. Rusk, 381 U.S. 1, 20 (1965) ("[I]f we are to avo[id] rendering a series of advisory opinions, adjudication of the reach and constitution[ality] of [a statute under which the President prohibited travel to Cuba] must await a con[crete] fact situation.").

Courts are particularly vigilant to ensure that cases are ripe when constitutional questions are at issue. See Communist Party of the United States v. Subversive Activities Control Bd., 367 U.S. 1, 81 (1961) (holding unripe an ex post [facto] challenge to Corrupt Practices Act especially in light of the rule to avoid unneces[sary] constitutional decisions). Indeed, the Supreme Court has held a constitutional cha[llenge] unripe because of the need for more detailed factual information in the record "[e]ven

22

though the challenged statute is sure to work the injury alleged."  Babbitt v. Unit[ed]

Workers Nat'l Union, 442 U.S. 289, 300 (1979).

Two Supreme Court cases illustrate the need for factual information parti[cularly]

well.  In Socialist Labor Party v. Gilligan, 406 U.S. 583 (1972), the Court dismiss[ed as]

unripe a challenge on First Amendment grounds to a state law that required candidat[es to]

swear not to attempt to overthrow the government by violence or force.  The Court

concluded that "the record . . . is extraordinarily skimpy in the sort of proved or

admitted facts that would enable us to adjudicate this claim."  Id. at 587. Even as[suming]

the plaintiffs had standing to challenge the law, the Court continued, "their case [was not]

given any particularity to the effect on them of Ohio's affidavit requirement."  I[d. at]

588.  In California Banker's Association v. Schultz, 416 U.S. 21 (1974), the Court

similarly declared unripe a First Amendment challenge to bank record-keeping and re[porting]

requirements because of an insufficient factual record.  Id. at 56.  "This Court, i[n the]

absence of a concrete fact situation in which competing associational and governmen[tal]

interests can be weighed, is simply not in a position to determine whether an effor[t to]

compel disclosure of such records would or would not be barred . . . ."  Id.

Megan's Law's registration provisions require simply that Artway register [and]

provide information to the local prosecutor, who in turn may provide the informatio[n]

to local law enforcement agents.  No private individuals or other organizations may

receive this information.  Registration, therefore, involves few variables in its

operation.  As in Duke Power, the issue is primarily one of law and further factual

information will provide little assistance.  Under these circumstances, we are conf[ident]

that Artway's registration challenge is fit for judicial review.

23

The notification procedures, on the other hand, involve dissemination of

potentially devastating information to undetermined numbers of private citizens.

these private citizens are not part of the trained state law enforcement mechanism,

less certain how they will react.  For instance, the one study in the record chroni

number of incidents of harassment at the hands of private citizens as a result of t

State of Washington's notification law, but records no incidents on the part of law

enforcement.  We also lack concrete record evidence about what Artway's future

dangerousness classification will be, on what facts this classification will be

determined, and who will be notified.[0]

Because Artway has not submitted to these procedures, and because the dis

court decided this case without admitting any appreciable evidence, we have almost

factual grounding on which to make an assessment about notification as applied to A

The record contains two pieces of data:  a flier distributed by the Guardian Angels

warning Woodbridge residents to "BEWARE" and the brief State of Washington report

---

[0] We recognize that some of the critical factual information, especially the effects
proposed notification on the registrant, will be difficult to chronicle.  In most c
we assume that registrants slated for notification will seek to enjoin the notifica
before it happens.  The actual consequences of notification on that person, of cour
cannot be known at that point.  Therefore, we wish to emphasize that our holding th
case is not ripe does not mean that all pre-notification challenges will be unripe.
the fact of notification is not speculative (because the state has expressed its in
notify), the district court enjoys flexibility to collect appropriate evidence so t
issue may be fit for judicial review.  District courts may see fit to admit a broad
of evidence, including but not limited to (1) threats or actions against the regist
triggered by notice from channels other than Megan's Law, (2) threats or actions ag
similarly situated registrants, especially those undergoing notification, and (3) s
of the effects of Megan's Law or similar notification laws.  We do not suggest, how
that evidence of community reaction is mandatory before a notification challenge wi
fit for judicial review.

describing the effects of a different law in that jurisdiction.[0]  While the tenor o

flier and the results of the study are worrisome indeed, they are but snippets comp

a developed record.  Consistent with the basic principles of Gilligan, Schultz et a

cannot make complex and important determinations in a factual vacuum.

Moreover, the constitutionality of the notification provisions of Megan's

may well turn on the most careful parsing of the Supreme Court's rulings on "punish

Not only must we decide whether a multifaceted and novel[0] regulatory scheme violate

constitutional safeguards, we must also discern the parameters of these safeguards

themselves.  As the discussion in Part V infra reveals, the law in this area, like

adolescent's room, needs tidying.  We may not undertake this task without factual t

---

[0]In addition to telling Woodbridge residents to "BEWARE," the flier suggests that a
registrant leafletting will be a regular result of notification:

> ATTENTION: Two time convicted rapist Artway, a 49 year old resident of
> the Avenel section of Woodbridge has successfully challenged Megan's
> Law.  After serving an 18 year sentence for sodomy. [sic] He cannot be
> made the subject of community notification.  Mr. Artway said "ya-hoo,
> I jump up in the air and click my heels. I can now move to another
> area -- in other words I can retreat -- and no fliers will follow me."

(A247).  The flier concludes by urging Woodbridge residents to "keep an eye on Alex
Artway (track his movements)" and requests anonymous "information about his whereab
Id.

The State of Washington study reports that, of the 176 sex offenders who
subject to notification in that state between 1990 and 1993, 14 have suffered acts
harassment.  These incidents include the following:  rock and egg throwing, threats
arson, picketing, posting warning fliers throughout the community, and spray painti
slogans like "Die, baby raper" and "Move or die" on the notification subject's home
personal property.  (A178). In half of the 14 cases, the harassment also extended t
members of the offender's family, or to people living with the offender.

[0]Although forty states have sex offender registration statutes, twenty-nine of thes
have been passed since 1990.  See Simeon Schopf, "Megan's Law": Community Notificat
the Constitution, 29 Colum. J.L. & Soc. Probs. 117, 120 (1995).  Moreover, of the n
of states whose laws permit community notification, New Jersey's is the most far-re
See id.; Doe, 142 N.J. at 41 n.9.

Thus, Artway's challenge to the notification provisions of Megan's Law fa

both prongs of the ripeness test.  The district court erred because, in analyzing t

hardship of denying review, it did not distinguish between registration and notific

it also omitted the fitness for judicial review prong entirely.  Whether Artway wil

be subject to Megan's Law's notification requirements remains a matter of speculati

the record lacks the factual information necessary for this Court to decide Artway'

notification claims consistent with its Article III obligations.

## C. Due Process Claims

Two of Artway's due process claims are also unripe. Artway argues that Me

Law denies him due process because, to avoid notification, he bears the burden of

persuasion to demonstrate that he is not a risk of future danger.  He also claims t

Megan's Law does not provide adequate notice of the State's intention to initiate

notification.  The district court did not reach these issues because it held the

notification provisions of Megan's Law unconstitutional under the Ex Post Facto Cla

Since we have already discussed ripeness extensively, we analyze these claims more

briefly.

1.        <u>Burden of Persuasion</u>

The Fourteenth Amendment forbids states from denying "life, liberty, or

property, without due process of law."  U.S. Const. amend. XIV.  For purposes of th

analysis, we will assume that notification under Megan's Law implicates a liberty i

under state law sufficient to invoke federal due process protections.  <u>Doe</u> found su

26

interest.  <u>See</u> 142 N.J. at 104; <u>accord</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983) (h

that Due Process Clause protects state created liberty interests as well as federal

<u>cf.</u> <u>Sandin v. Connor</u>, 115 S. Ct. 2293, 2297-2300 (1995) (rejecting <u>Hewitt</u>'s methodo

examining state regulations rather than nature of deprivation in determining existe

liberty interest and suggesting limits on scope of state-created liberty interests

trigger federal due process safeguards).

Due process is a flexible concept determined by application of a three-pa

balancing test:  (1) the private interests affected by the proceeding; (2) the risk

error imposed by the procedure created by the State; and (3) the countervailing int

in using the procedures it adopted.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (19

This test applies to burdens of proof.  <u>See</u> <u>Heller v. Doe</u>, 113 S. Ct. 2637, 2644 n.

(1993).

Artway argues that all three factors of the <u>Mathews</u> test counsel rejectio

the State's procedure, which places the burden of persuasion on the sex offender to

that he is not dangerous in order to avoid notification.  Rather, Artway contends,

State should bear the burden of persuasion and that burden should be by clear and

convincing evidence.  Artway submits that (1) his private interest in not being bra

dangerous sex offender is very great; (2) the fact that the State possesses greater

resources counsels that it should bear a greater share of the burden (especially wh

Artway is called on to "prove the negative," i.e., that he is not dangerous); and (

State's interest is in getting the determination right, not in notifying in all cas

<u>Cf.</u> <u>Santosky v. Kramer</u>, 455 U.S. 745 (1982) (state bears burden of persuasion by cl

27

convincing evidence for parental-rights termination); <u>Addington v. Texas</u>, 441 U.S.

(1979) (same for civil commitment proceedings).

Artway also asserts that judicial deference to the prosecutor's findings

violates due process by establishing a constitutionally excessive presumption agair

<u>Cf.</u> <u>Virgin Islands v. Parrilla</u>, 7 F.3d 1097 (3d Cir. 1993) (striking down statute c

rebuttable mandatory presumption).  Under Megan's Law, the judge "shall affirm the

prosecutor's determination unless . . . persuaded by a preponderance of the evidenc

it does not conform to the laws and the Guidelines."  <u>Doe</u>, 142 N.J. at 32.

Although Artway's challenges on these issues are forceful, his claims are

ripe.  That he will ever confront the process he challenges is entirely speculative

this point. This process is available to contest <u>notification</u> decisions, and Artway

be the subject of notification (as opposed to merely registration) only if he is

classified as a Tier 2 (moderate risk) or Tier 3 (high risk) offender.   While we k

that Artway will be prosecuted if he does not register, we do not know whether, eve

does register, he will ever need to utilize the process he challenges.


2.        <u>Notice</u>

Due process requires "notice reasonably calculated, under all circumstanc

apprise interested parties of the pendency of the action and afford them an opportu

present their objections."  <u>Mullane v. Central Hanover Bank & Trust</u>, 339 U.S. 306,

(1950).  Artway argues that Megan's Law does not provide for adequate notice of the

commencement of notification proceedings.  The Law requires notice to registered se

offenders classified as Tier 2 or Tier 3 before the corresponding notification occu

28

However the Act, as interpreted by <u>Doe</u>, dispenses with notice when "impossible as a practical matter." 142 N.J. at 30-31.  An erroneous notification would inflict an irreparable deprivation of his liberty interest, Artway argues, so that the State c never dispense with notice (and his corresponding right to a hearing).  <u>See</u> <u>United v. Raffoul</u>, 826 F.2d 218, 224 (3d Cir. 1987) ("[A] likelihood of irreparable harm resulting from the lack of a pre-deprivation hearing is a private interest which countervails any public interest in streamlined administration.").

But Artway's notice claim is unripe for the same two reasons as his "puni and burden of persuasion challenges. First, his need for notice about proposed notification is speculative.  Artway will need notice only if he is classified as or Tier 3 risk.  Second, the record in this case is insufficient to make this determination.  The question is whether the notice requirement of Megan's Law satis the strictures of due process.  <u>Mullane</u> makes clear that the right to notice is not absolute; rather, Artway has a right to "reasonably calculated" notice.  339 U.S. a And <u>Raffoul</u> demonstrates that the State cannot dispense with notice when that notic possible and irreparable harm could result. 826 F.2d at 224.  Against this legal ba we must evaluate Megan's Law's "impossible as a practical matter" standard, but we factual matrix against which to evaluate this standard because Artway has not submi Megan's Law.[0]

---

[0] Furthermore, the state court has not yet interpreted this standard.  To the extent court interpretation would make the standard comport with due process, abstention w probably be appropriate even if the issue were ripe.  <u>See</u> <u>Railroad Commission v. Pu</u> 312 U.S. 496 (1941).  We assume that Artway will be entitled to notice, since his whereabouts seem to be known, so long as he does not pose an immediate danger.

**D. Summary of Unripe Claims**

In summary, we conclude that Artway's ex post facto, double jeopardy, bil

attainder, and due process challenges to Megan's Law's notification provisions are

ripe.[0]  We therefore vacate the judgment of the district court insofar as it holds

and Tier 3 notification unconstitutional, and direct it to dismiss Artway's due pro

claims to the extent they concern notification.


**V.      REGISTRATION**
### A. "Punishment" Under the Ex Post Facto, Bill of Attainder,

### and Double Jeopardy Clauses

We turn now to the merits of Artway's ripe challenge: that the <u>registrati</u>

provisions of Megan's Law violate the Ex Post Facto, Bill of Attainder, and Double

Jeopardy Clauses.  We begin by recapping the nature of those protections.  The

Constitution provides that "[n]o state shall . . . pass any . . . ex post facto Law

U.S. Const. art. I, § 10.  Under the Ex Post Facto Clause, the government may not a

---

[0]Artway's contention at oral argument that his challenge is both facial and as-appl
does nothing to overcome his ripeness problem.  In the limited context of the First
Amendment, a facial challenge allows a litigant to argue that a law is unconstituti
in a set of circumstances not necessarily present in his own case -- on the basis o
"overbreadth."  <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).  Artway's
challenge obviously does not rely on the First Amendment.  To make a successful fac
challenge in a non-First Amendment context, a litigant "must establish that no set
circumstances exists under which the Act would be valid."  <u>Id.</u>  Artway has made no
contention, let alone proved it, that notification under Megan's Law would be
unconstitutional under all circumstances.  For example, his "punishment" claims, wh
rely on some notion of retroactivity, would fail if the sex offender committed his
after Megan's Law was enacted.  In any event, a facial challenge does not -- and ca
excuse basic Article III case or controversy requirements, such as that the plainti
actually be aggrieved by the challenged statute.

law retroactively that "inflicts a greater punishment, than the law annexed to the [crime], when committed."  Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798).

The Constitution also forbids states to "pass any Bill of Attainder."  U.S. Const. art. I, § 10.[0]  Under the Bill of Attainder Clause, legislatures are forbidden [to] enact "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial."  United States v. Brown, 381 U.S. 437, 448-49 (1965).

Finally, the Constitution provides: "[N]or shall any person be subject for [the] same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  [The] Double Jeopardy Clause prohibits, inter alia, "a second prosecution for the same offense after conviction . . . and multiple punishments for the same offense."  United States v. Halper, 490 U.S. 435, 440 (1989).  The threshold question under each clause, therefore, [is] whether the registration provisions of Megan's Law impose "punishment."  If registration does not impose punishment, our inquiry with respect to the registration issue is at an end.[0]

_____

[0]Underlining the importance of these clauses in the eyes of the Framers, the Bill of Attainder and Ex Post Facto Clauses apply to both the federal government and the states in the original terms of the Constitution.  See U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto law shall be passed."); U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder [or] ex post facto Law . . . .").

[0]While even Artway's ex post facto claim fails, we think that it is probably his best challenge.  Bills of attainder inflict punishment "without a judicial trial."  Brown, 381 U.S. at 448-49. Artway, of course, has had a trial, at which he was convicted of the [offense] triggering registration.  The real complaint is not that the legislature has circumvented the judicial process, but that it has changed the results of that process.  This is the essence of an ex post facto challenge.

Double jeopardy is probably a stronger challenge than the bill of attainder claim, but it too has its drawbacks.  Ex post facto laws are particularly objectionable

31

We must sort through several key cases involving these various provisions

derive (or, perhaps more appropriately given the confused state of the law, "divine

test for punishment.  In the end, we develop a multi-part test that looks to the

legislature's subjective purpose in enacting the challenged measure, its "objective

purpose in terms of proportionality and history, and the measure's effects.

1.        De Veau v. Braisted:  Subjective Purpose

We start with De Veau v. Braisted, 363 U.S. 144 (1960), in which the Supr

Court announced a subjective (or actual) legislative purpose test.  In that case, t

Court upheld, against bill of attainder and ex post facto challenges, a law forbidd

certain unions employing former felons from collecting dues.  In effect, the law ba

because they deprive their object of all notice.  See, e.g., Miller v. Florida, 482
423, 429 (1987); Weaver v. Graham, 450 U.S. 24, 30 (1981).  In contrast, the Double
Jeopardy Clause bars the imposition of a second "punishment" in a separate proceedi
though the punishment was authorized at the time of the crime but just not sought a
same time as the first punishment.  In addition, seven judges of the Ninth Circuit
recently pointed out the practical problem with broadly interpreting forfeitures as
constituting "punishment" for double jeopardy purposes:  those who forfeit illegal
proceeds at the time of their arrest cannot be criminally prosecuted.  See United S
v. $405,089.23 U.S. Currency, 56 F.3d 41, 42 (9th Cir. 1995) (Rymer, J., with whom
Wiggins, Kozinski, O'Scannlain, Trott, and Nelson, J.J., join, dissenting from deni
rehearing).  Given these equitable and practical factors, courts may be more reluct
deem measures "punishment" in a double jeopardy challenge, especially to the extent
must make difficult judgment calls under the test described infra.
        Indeed, at least one Justice has noted the equitable factor in arguing th
double jeopardy does not bar punishing twice.  See United States v. Hess, 317 U.S.
555 (1943) (Frankfurter, J., concurring) ("The short of it is that where two such
proceedings merely carry out the remedies which Congress has prescribed in advance
wrong, they do not twice put a man in jeopardy for the same offense.").  Of course,
Justice Frankfurter's position has not carried the day.  But two current Justices h
recently expressed their view that the Double Jeopardy Clause does not apply to mul
punishments.  See Department of Revenue v. Kurth Ranch, 114 S. Ct. 1937, 1955-59 (1
(Scalia, J., with whom Thomas, J., joins, dissenting) ("'To be put in jeopardy' doe
remotely mean 'to be punished,' so by its terms this provision prohibits, not multi
punishments, but only multiple prosecutions.").

convicted felons from working on the New York and New Jersey waterfront.  The Court

explained that "[t]he question in each case where unpleasant consequences are broug

bear upon an individual for prior conduct, <u>is whether the legislative aim</u> was to pu

that individual for past activity, or whether the restriction of the individual com

about as a relevant incident to a regulation of a present situation, such as the

qualifications of a profession."  <u>Id.</u> at 160 (emphasis added).

　　　　"The proof is overwhelming," the Court continued, "that New York sought n

punish ex-felons, but to devise what was felt to be a much-needed scheme of regulat

the waterfront, and for the effectuation of that scheme it became important whether

individuals had previously been convicted of a felony." <u>Id.</u>  This early case, empha

by New Jersey, suggests that actual legislative purpose is the only inquiry.  But

subsequent cases make clear that this is no longer true.


2.　　　　<u>United States v. Halper:  Objective Purpose through Proportionality</u>

　　　　Almost thirty years later, in <u>United States v. Halper</u>, 490 U.S. 435 (1989

Court articulated an "objective" legislative intent test -- the test central to the

arguments of both Artway and the State.  <u>Halper</u> held that a sizeable fine, imposed

civil proceeding after the defendant's conviction for Medicare fraud, violated the

Jeopardy Clause.  The Court analyzed the issue by determining whether the fine serv

purposes of punishment, including retribution and deterrence, or instead satisfied

remedial purpose.  "Simply put, a civil as well as a criminal sanction constitutes

punishment," the Court said, "when the sanction as applied in the individual case s

the goals of punishment."  Id.

> We have recognized in other contexts that punishment serves the twin
> aims of retribution and deterrence.  Furthermore, retribution and
> deterrence are not legitimate nonpunitive governmental objectives.
> From these premises, it follows that a civil sanction that cannot be
> fairly said solely to serve a remedial purpose, but rather can only be
> explained as also serving either retributive or deterrent purposes, is
> punishment, as we have come to understand that term.

Id. at 448 (citations and internal quotations omitted) (emphasis added).

The Court found that the fine in that case -- $130,000 -- bore "no ration

relation" to the legitimate remedial purpose -- compensating the government for its

$16,000 in costs.  Id. at 449.  Therefore, the Court held that the Double Jeopardy

barred the additional civil sanction after criminal punishment "to the extent that

second sanction may not fairly be characterized as remedial, but only as a deterrer

retribution."  Id. at 448-49.[0]

---

[0]Seemingly inconsistent language in Halper has perplexed some courts.  Therefore, w
explain in the margin how we think all the parts fit together.  Halper declared: Fr
these premises, it follows that a civil sanction that cannot fairly be said solely
serve a remedial purpose, but rather can only be explained as also serving either
retributive or deterrent purposes, is punishment, as we have come to understand the
We therefore hold that under the Double Jeopardy Clause a defendant who already has
punished in a criminal prosecution may not be subjected to an additional civil sanc
the extent that the second sanction may not fairly be characterized as remedial, bu
as a deterrent or retribution.
490 U.S. at 448-49 (citations and internal quotations omitted) (emphasis added).

On an initial reading, the first "solely" clause of the first sentence an
second "only" sentence seem to point in a different direction than the "only be exp
as also serving either retributive or deterrent purposes" language on which we base
analysis.

But the various parts of this excerpt can be reconciled; indeed they must
the majority in Halper certainly thought its declarations in this passage were cons
As we illustrate with our subsequent soupmeat hypothetical, a measure is "punishmen
it can "only be explained as also serving either retributive or deterrent purposes.
other words, if the measure is excessive in relation to its proffered remedial purp

34

Because <u>Halper</u> occupies such a central role in the punishment inquiry, a [...] of explanatory observations are in order.  The first is a matter of semantics:  a [...] understanding of the terms "retributive," "deterrent," and "remedial" is critical t[...] applying the <u>Halper</u> test.  We therefore explain how we think the Supreme Court is u[...] the terms; at least the reader will know how we are using them.  Retribution is ver[...] for its own sake.  It does not seek to affect future conduct or solve any problem e[...] realizing "justice." Deterrent measures serve as a threat of negative repercussions[...] discourage people from engaging in certain behavior.  Remedial measures, on the oth[...] hand, seek to solve a problem, for instance by removing the likely perpetrators of [...] corruption instead of threatening them (<u>De Veau</u>), or compensating the government fo[...] incurred (<u>Halper</u>).

Of course, as the cases point out, a measure could serve all three functi[...] For instance, putting someone in jail for a sex offense serves the retributive func[...] hurting that person, the deterrent purposes of convincing him and others not to eng[...] that behavior to avoid the adverse consequences, and the remedial purpose of keepin[...]

---

will be "punishment."  The second sentence says the same thing if one focuses on th[...] "fairly be characterized" language.  A measure may not "<u>fairly</u> be characterized as [...] remedial," but rather may <u>fairly</u> be characterized "only as a deterrent or retributi[...] it can "only be explained as also serving either retributive or deterrent purposes.[...] the first "solely" part of the first sentence, like the second sentence, can be rec[...] with the rest of the paragraph by focusing on the words "<u>fairly</u> be said" (as oppose[...] just "be said") and "serve that purpose" (as opposed to have that effect).

This reading of the paragraph is consistent with the other language in th[...] opinion (such as its "rational relation" discussion), the analysis of the case, and [...] holding:  that the fine in question was punishment to the extent it vastly exceeded [...] government's remedial purpose -- recouping its costs of prosecution -- because such [...] excessive fine can only be explained as also serving either deterrent or retributiv[...] purposes.

35

away from others (at least outside the prison).  Another complication is that measu

have one or more of these _effects_ without having that _purpose_.

       With this lexicon in mind, we turn to an explication of the _Halper_ calcul

which evaluates the proportionality of ends to means.  To recapitulate, the _Halper_

whether "a civil sanction that cannot be fairly said solely to serve a remedial pur

but rather can _only_ be explained as also serving either retributive or deterrent pu

is punishment."  _Id._ at 448. (emphasis added).  The threshold question is thus whet

remedial purpose can explain the sanction.  Only if the remedial purpose is insuffi

to justify the measure, and one must resort also to retributive or deterrent

justifications, does the measure become punitive.  Only then can the measure "_only_

explained as also serving either retributive or deterrent purposes."

       To illustrate with a venerable statutory interpretation hypothetical, ass

that someone is sent to the store in the snow for soupmeat.  The trip can be explai

solely by the remedial purpose of obtaining food, even though the trip through the

could also serve retributive purposes.  _See_ _id._ at 447 n.7 ("[O]ur cases have ackno

that for the defendant even remedial sanctions carry the sting of punishment.").

therefore qualifies as non-punishment under _Halper_.  On the other hand, assume now

without additional justification, the agent is sent without clothes.  This addition

aspect of the trip cannot be explained by the remedial purpose of obtaining food; t

excursion can only be explained as partly serving retributive purposes.  It therefo

constitutes "punishment" under the _Halper_ test.[0]

---

[0]In his concurrence, Judge Shadur intimates that we may have overresolved _Halper_.
[slip op. at 5].  We disagree.  Our task, we believe, is to derive a general rule f
Supreme Court's precedents and apply it to the facts of this case, not tailor a spe

36

Halper thus contributes an important element to our analysis: it adds an objective inquiry to supplement the actual legislative purpose test of De Veau. "[T]constitutional protection is intrinsically personal. Its violation can be identifi by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." Id. at 447; see also id. at 453 (Kennedy, J., concurring) ("Today's holding, I would stress, constitutes an objective rule that is grounded i nature of the sanction and the facts of the particular case.").[0]

By acknowledging that "civil" penalties may constitute punishment, Halper departs from the practice of placing talismanic significance on the legislative lab affixed to the disputed provision and searching for the frequently unknowable and nondispositive subjective intent of the legislative body: "[T]he labels 'criminal'

---

rule to the facts. We also disagree with Judge Shadur's view that the "rule for a case" language of Halper limits the general ends-means test of that case. Id. As words Judge Shadur quotes make clear, the "rule" is not the general Halper calculus the holding of that case: that only under the extreme factual circumstances of Hal does a fixed-penalty provision constitute "punishment" under the general means-ends In any event, we agree with Judge Shadur that our differences in this complex case small indeed.

[0]Even though Halper was a double jeopardy case, its move away from subjective purpo should apply to ex post facto and bill of attainder claims as well. The Court expl that the subjective approach was appropriate in "identifying the inherent nature of proceeding, or in determining the constitutional safeguards that must accompany tho proceedings." 490 U.S. at 447; see also infra pages 56-59 and accompanying notes (discussing cases interpreting this different protection under the Fifth and Sixth Amendments). However, the Court continued, "the approach is not well suited to the interests' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments." Id. The Ex Post Facto and Bill of Attainder Clauses, of course, imp the same "humane interests" as double jeopardy protections. The move to a more obj analysis, therefore, is better understood as a change of approach than as resting o fundamental difference in the nature of double jeopardy, ex post facto, and bill of attainder protections.

'civil' are not of paramount importance. . . .  The notion of punishment . . . cuts

the division between the civil and the criminal law."  Id. at 447-48.[0]

The Halper objective ends-means test is a step down the road to limiting

especially harsh effects, but still any "sting" could be permissible with a suffici

post hoc remedial "purpose."  For example, the need for supper could explain the tr

through the snow even if the temperature were below zero.

3.		Austin v. United States:  Objective Purpose through History

Four years after Halper, in Austin v. United States, 113 S. Ct. 2801 (199

Court added yet another dimension to the punishment question: a focus on history.

Court held that civil forfeiture is "punishment" subject to the Excessive Fines Cla

the Eighth Amendment.  The government had argued that forfeiture of a mobile home a

shop after the owner was convicted of a drug offense served the remedial purpose of

compensating the government for its costs in investigating and prosecuting these of

In setting out the appropriate analysis, the Austin Court rescribed the key passage

Halper.

> We said in Halper that "a civil sanction that cannot fairly be said
> solely to serve a remedial purpose, but rather can only be explained
> as also serving either retributive or deterrent purposes, is
> punishment, as we have come to understand the term."

Id. at 2806 (quoting Halper, 490 U.S. at 448).

---

[0] In moving past exclusive reliance on subjective legislative intent, the Court part
heeded the admonition of Justice Frankfurter, expressed almost half a century earli
that such "dialectical subtleties" were an unworkable approach to "punishment"
jurisprudence.  See United States v. Hess, 317 U.S. 537, 554 (1943).

The <u>Austin</u> Court then took a different tack than the <u>Halper</u> Court: it app

the <u>Halper</u> test primarily by examining history, rather than proportionality.  "We t

then, to consider whether, at the time the Eighth Amendment was ratified, forfeitur

understood at least in part as punishment and whether forfeiture under [the statute

question] should be so understood today."  <u>Id.</u>  Examining history, it concluded tha

forfeiture has traditionally been regarded as punishment. Looking to the language a

legislative history of the statute as a whole, the Court determined that these fact

confirmed that the forfeiture statute served a punitive purpose, regardless of the

proportionality of the particular forfeiture to the government's costs.[0]  <u>Id.</u> at 28

It therefore remanded for a determination whether the forfeiture, by being "excessi

violated the Eighth Amendment.  <u>Id.</u>

According to <u>Austin</u>, a measure that has historically served punitive purp

punishment unless the text or legislative history shows a contrary purpose.  <u>Id.</u> at

("We find nothing in these provisions or their legislative history to contradict th

historical understanding of forfeiture as punishment.").  Thus, even if a remedial

---

[0] Thus, <u>Halper</u> and <u>Austin</u> are somewhat in tension.  <u>Halper</u>, examining the proportion
of the fine in question to the government's costs, held that a fine was "punishment
to the extent it was disproportionate to the government's costs.  490 U.S. 448-49.
<u>Austin</u>, relying primarily on history and looking at the statute as a whole (rather
the particular forfeiture in question), holds that forfeiture is "punishment" <u>regar</u>
of its proportionality to the government's costs.  113 S. Ct. at 2811-12 & n.14.
After a cursory attempt to distinguish <u>Halper</u> in a footnote, <u>Austin</u> expla
that it makes "little practical difference whether the Excessive Fines Clause appli
all forfeitures under [the relevant statute] or only to those that cannot be charac
as purely remedial."  <u>Id.</u>  "The Clause prohibits only the imposition of 'excessive'
fines," the Court explained, "and a fine that serves purely remedial purposes canno
considered 'excessive' in any event."  <u>Id.</u>  This may be so, but it collapses <u>Austin</u>
Eighth Amendment analysis into <u>Halper</u>'s double jeopardy inquiry:  "punishment" is n
excessive if it is not "punishment."

could fully explain a measure, thereby satisfying <u>Halper</u>, it will not pass <u>Austin</u>

if it has historically been considered punishment and neither the text nor the legi

history contradicts this purpose.  To draw again on our soupmeat hypothetical, send

someone out into the snow <u>would</u> be punishment if doing so was traditionally regarde

punitive and the sender did not make his plausible remedial purposes clear.  This w

the case even though a remedial purpose -- fetching soupmeat -- could fully explain

action.  Without a convincing counterrationale, something understood as punishment

long simply "cannot fairly be said solely to serve a remedial purpose, but rather

be explained as also serving retributive or deterrent purposes."  <u>Id.</u> at 2806.

The <u>Austin</u> objective purpose analysis also represents a move toward analy

the <u>effect</u> of a provision in ascertaining whether it inflicts "punishment."[0]  Thoug

speaks of legislative "purpose," the more likely and appropriate concern in a histo

inquiry is the nature of the measure itself.  Even the text and legislative history

inquiry of <u>Austin</u> can be understood as going more to the nature of the provision it

rather than the subjective intent of the legislators.

In concluding our discussion of <u>Austin</u>, we must question whether, as some

have assumed, that case establishes that "punishment" for purposes of one constitut

protection is necessarily "punishment" for another.  <u>See</u> <u>United States v. $405,089.</u>

<u>Currency</u>, 33 F.3d 1210, 1219 (9th Cir. 1994) ("We believe that the only fair readin

---

[0]This transition was presaged in <u>United States v. One Assortment of 89 Firearms</u>, 46
354 (1984).  In that case, the Court held that double jeopardy did not bar a civil
proceeding seeking forfeiture of firearms after the owner was acquitted in a separa
criminal proceeding.  Though the Court still placed decisive weight on actual legis
purpose, it also inquired "whether the statutory scheme was so punitive in purpose
<u>effect</u> as to negate that intention."  <u>Id.</u> at 362-63 (emphasis added).

40

<u>Austin</u> is that it resolves the 'punishment' issue with respect to forfeiture cases

purposes of the Double Jeopardy Clause as well as the Excessive Fines Clause."), <u>a</u>

<u>on denial of rehearing</u>, 56 F.3d 41 (1995), <u>cert. granted</u>, 116 S. Ct. 763 (1996).

Court, noting the tension between <u>Halper</u> and <u>Austin</u>, has rejected the Ninth Circuit

reading of <u>Austin</u> as resolving all forfeitures under § 881 as presumptively punishm

purposes of the Double Jeopardy Clause.  <u>See</u> <u>United States v. $184,505.01 in U.S.</u>

<u>Currency</u>, 72 F.3d 1160 (3d Cir. 1995) (rejecting holding and reasoning of <u>United St</u>

<u>$405,089.23 U.S. Currency</u>, 33 F.3d 1210 (9th Cir. 1994)).[0]

Nevertheless, we believe that the historical methodology of <u>Austin</u>, as op

to its broad language and holding, must be applicable to other punishment determina

historical analysis is a staple of constitutional interpretation, including those

guarantees dealing with "punishment."  <u>Cf.</u> <u>Nixon v. Administrator of General Servic</u>

U.S. 425, 475 (1977) (examining history to determine whether access restrictions on

---

[0]While this Court has rejected <u>$405,089.23</u>, we do not agree entirely with the reaso
the Ninth Circuit dissenters from the denial of rehearing.  The dissent criticizes
opinion as merging "the inquiry for excessive fines cases -- whether the amount for
is partly punishment -- into double jeopardy cases, where the issue is whether the
forfeited is entirely punishment."  56 F.3d at 43.

This is incorrect.  <u>Austin</u> adds a historical analysis (and examines the s
as a whole rather than the specific measure in question), but it does not change th
underlying nature of the <u>Halper</u> calculus.  In fact, <u>Austin</u> follows its statement th
must determine whether this forfeiture serves "in part to punish" by quoting the st
from <u>Halper</u> and citing that case. If this were not clear enough, the Court explains
"relevant question" again later in the opinion as being the <u>Halper</u> analysis: "Under
<u>States v. Halper</u>, 490 U.S. 435, 448, 109 S. Ct. 1892, 1901, 1104 L. Ed. 2d 487 (198
question is whether the forfeiture serves <u>in part</u> to punish, and one need not exclu
possibility that forfeiture serves other purposes to reach that conclusion."  113 S
at 2810 n.12.  The question is not whether the measure is "partly punishment" or "e
punishment"; the question is whether it is "punishment."  And a measure that <u>serves</u>
part to punish (as opposed to merely having some negative effect) is "punishment."
<u>Halper</u> calculus is admittedly somewhat confusing, but we have done our best to expl
it above.  See <u>supra</u> pages 38-44 and accompanying notes.

41

presidential papers constituted "punishment" for Bill of Attainder Clause); <u>Bell v.</u>
<u>Wolfish</u>, 441 U.S. 520, 590 n.23 (1979) (Stevens, J., dissenting) (The Supreme Court
probably relied upon historical analysis more often than on any of the other object
factors . . . [to] determin[e] whether some government sanction is punitive.") (cit
cases).

4.        <u>Department of Revenue v. Kurth Ranch: Objective Purpose and Deterrence</u>
        One year after deciding <u>Austin</u>, the Court added another wrinkle in <u>Depart</u>
<u>Revenue v. Kurth Ranch</u>, 114 S. Ct. 1937 (1994), announcing that the "no deterrent p
rule of <u>Halper</u> and <u>Austin</u> does not apply in all situations. <u>Kurth Ranch</u> held that
Montana's Dangerous Drug Tax violated the Double Jeopardy Clause. The Montana law,
taxed illegal drugs and equipment at rates up to 400 percent, constituted "punishme
because it was "a concoction of anomalies, too far removed in crucial respects from
standard tax assessment to escape characterization as punishment for the purpose of
Jeopardy analysis." <u>Id.</u> at 1948. Because Montana levied this tax in a separate
proceeding, after the defendants were tried and sentenced, this punishment violated
Double Jeopardy Clause. <u>Id.</u>

        <u>Kurth Ranch</u> further expanded on the historical inquiry begun in <u>Austin</u>.
distinguished the rule of <u>Halper</u> -- that any deterrent purpose makes a law punishme
on the ground that fines and forfeitures "are readily characterized as sanctions" w
taxes have typically served the salutary[0] purpose of raising revenue. <u>Id.</u> at 1946.

---

[0] We use the term "salutary" to include both remedial and otherwise beneficial goals

the Court explained, a high tax rate and even a deterrent purpose would not automat

render a tax punitive.  Id. at 1947.

The Court then examined whether the particular tax at issue operated in t

usual manner of most taxes.  It differentiated among taxes with a pure revenue rais

purpose, mixed-motive taxes imposed both to deter a disfavored activity and to rais

revenue, and taxes imposed upon illegal activities. Pure revenue raising taxes are

"punishment," the Court said, because they are imposed despite their negative effec

the taxed activity.  Id.  Even mixed-motive taxes, such as those imposed on cigaret

sales, are not "punishment" because the government wishes the activity to continue

extent that its benefits -- including tax revenues -- outweigh its harms. However,

Court found that these salutary justifications "vanish when the taxed activity is

completely forbidden, for the legitimate revenue-raising purpose that might support

tax could be equally well served by increasing the fine imposed upon conviction."

The Court held that because a tax on illegal drugs did not operate in the usual man

the historically non-punitive purposes of taxes could not insulate this tax from be

considered "punishment."  Id. at 1948.

The main significance of the Kurth Ranch limitation is that, at least for

measures that have historically served salutary functions, even some deterrent purp

will not render a measure "punishment":  "We begin by noting that neither a high ra

taxation nor an obvious deterrent purpose automatically marks this tax a form of

punishment."  Id. at 1946 (emphasis added).  In these cases, courts must examine wh

the particular measure at issue operates in a "usual" manner consistent with its

historically salutary or mixed purposes.[0]

---

[0]Thus, we disagree with the First Circuit's understanding of Kurth Ranch and Halper
situations involving neither fines nor taxes.  See United States v. Stoller, No. 95
1996 WL 77883 (1st Cir. Feb. 29, 1996).  Stoller argues that Kurth Ranch supplies t
general rule -- which Stoller dubs the "totality of circumstances" test -- while Ha
an "exception" for "monetary" penalties.
          We are unpersuaded by Stoller's limitation of Halper. Cabining Halper to
"monetary" penalties is not supported by the broad language of that case.  Reading
in Halper so strictly limiting it, we are loath to read it so narrowly without inst
from the Supreme Court.  Stoller claims that the Supreme Court gave such an instruc
Kurth Ranch.  But we read nothing in Kurth Ranch indicating that it supplies the ge
rule and Halper provides the exception.  The majority opinion in Kurth Ranch, quoti
Chief Justice Rehnquist's dissent therein, explains that because "tax statutes serv
purpose quite different from civil penalties, . . . Halper's method of determining
the exaction was remedial or punitive 'simply does not work in the case of a tax
statute.'"  114 S. Ct. at 1948.  If so, then why not read Kurth Ranch as an "except
for tax cases?  What makes Kurth Ranch the general rule and Halper the exception in
involving neither fines nor taxes?  We believe that the better course when evaluati
measure that is neither a "civil penalty" nor a "tax" is to synthesize both Halper
Kurth Ranch and generalize them to the extent their language will support.
          We think that Stoller's limited reading of Halper may stem from a
misunderstanding of the Halper calculus.  Stoller states that, unlike monetary sanc
many non-monetary sanctions "cannot fairly be characterized as serving only punitiv
purposes." 1996 WL 77883, at *6 (emphasis added).  It thus suggests, incorrectly, t
this is what Halper requires.  As footnote 16 of our opinion describes in detail, a
measure constitutes "punishment" under Halper if it may "fairly be characterized on
deterrent or retribution."  490 U.S. at 449.  The accurate placement of the "only"
modifying "characterized" instead of "punitive" --changes the meaning of that phras
entirely, making the test much less strict than the First Circuit reads it.
          We also disagree with Stoller's rationale that Halper is limited to "mone
penalties because only "fines, forfeitures, and other monetary penalties . . . are
quantifiable in actual or approximate monetary terms."  1996 WL 77883, at *5.  Whil
judging the proportionality of ends to means may be slightly more difficult in a no
monetary setting, courts compare qualitative means to qualitative ends all the time
Courts regularly use ends-means analysis in equal protection and due process cases
evaluate difficult-to-quantify rights (liberty, free speech, free exercise) like th
at issue here.  The feasibility of applying Halper generally is demonstrated by our
soupmeat hypothetical, as well as the many cases that have used the calculus to det
the constitutionality of revoking drivers' licenses for drunk driving. See, e.g., M
v. Jones, 666 A.2d 128 (Md. Ct. App. 1995), cert. denied, 1996 WL 26460 (Mar. 18, 1

44

Kurth Ranch also reemphasizes that at least some negative effect on the

defendant does not convert a measure into "punishment."  "We note[], however, that

a sanction constitutes punishment is not determined from the defendant's perspectiv

even remedial sanctions carry the 'sting of punishment.'"  Id. at 1945 n.14 (citati

omitted).

5.          California Department of Corrections v. Morales: Effect

Most recently, California Department of Corrections v. Morales, 115 S. Ct

(1995), contributed two additional elements to the "punishment" analysis: it furthe

shifts the focus from a law's purpose to its effect, and it establishes that the

---

Furthermore, we think that Stoller's strict limitation of Halper is incon
with Stoller's own approach.  Indeed, after arguing for Halper's inapplicability to
own case, Stoller itself proceeds to apply Halper.  See 1996 WL 77883, at *12 ("Hal
expressly recognizes that civil sanctions need not be precisely calibrated in order
survive scrutiny under the Double Jeopardy Clause as long as they work 'rough remed
justice.'  We think this principle is fully transferable to the debarment context.'
(citation omitted).

Stoller's attack on Halper is also unnecessary to its result.  Even under
approach, which uses Halper to analyze proportionality as part of a larger test, th
limited debarment order challenged in Stoller would not constitute "punishment."  W
be hard pressed to conclude otherwise in view of the Supreme Court's decision in th
factually similar cases of De Veau and Hawker v. New York, 170 U.S. 189 (1898).

Nevertheless, our approach differs from the First Circuit's in our applic
of Halper to this situation.  Given our broader test incorporating DeVeau, Austin,
Ranch, and Morales, we do not think that exclusive reliance on Halper is proper.  B
Halper is not inapplicable, "dysfunctional," or particularly strict in non-monetary
settings such as this.  And Stoller's "totality of the circumstances" test, which i
purports to extract from Kurth Ranch, is neither described as such by that opinion
sufficiently determinate to be helpful (like the similar Kennedy v. Mendoza-Martine
U.S. 144 (1963), test rejected by the Supreme Court for Double Jeopardy analysis).

45

appropriate "punishment" analysis is flexible and context-dependent.  In Morales, t

Court rejected an ex post facto challenge to a California statute that decreased a

prisoner's entitlement to parole eligibility hearings.  Under the law in effect at

time of the defendant's crime, he was entitled to parole suitability hearings every

after his initial parole determination.  Id. at 1600.  The California legislature

subsequently amended the law to allow the review board to defer subsequent suitabil

hearings if (1) the prisoner has been convicted of "more than one offense which inv

the taking of a life," and (2) the board "finds that it is not reasonable to expect

parole would be granted."  Id. (citing Cal. Penal Code Ann. § 3041.5(b)(2) (West 19

After finding the defendant unsuitable for parole, the review board invoked this ne

provision to delay his next suitability hearing for three years.  Id.

As with the other cases discussed so far, the Court framed the question a

whether the measure "increased the 'punishment' attached to respondent's crime."  I

1601. Rejecting the defendant's claim that this change constituted "punishment," th

distinguished cases holding that legislative changes effectively increasing jail te

violated the Ex Post Facto Clause.  Id.  Unlike the measures in those cases, the Co

said, the statute at issue "creates only the most speculative and attenuated risk o

increasing the measure of punishment attached to the covered crimes."  Id. at 1605.

likelihood of parole for those covered -- double murderers -- is "quite remote."  I

1603.  Moreover, the "carefully tailored" authority of the board directs it to dela

hearings only when it concludes that the hearings would be of no avail to the priso

Id. at 1604.

46

Morales makes clear that a law can constitute unconstitutional "punishme[nt]" because of its effects.  The Court leads off its discussion with the declaration th[at] "[t]he legislation at issue here effects no change in the definition of respondent'[s] crime."  Id. at 1601.  The opinion then spends the bulk of its analysis examining t[he] effect of the legislative change on Morales.  See id. at 1601-04.  In doing so, it concedes that a measure effectively extending a sentence of imprisonment constitute[s] punishment, presumably regardless of the legislature's motivation.  See id. at 160[1] (citing and distinguishing Lindsey v. Washington, 301 U.S. 397 (1937); Miller v. Fl[orida,] 482 U.S. 423 (1987); Weaver v. Graham, 450 U.S. 24 (1981)).  Morales concludes that [the] impact on the prisoner was not great enough to warrant finding an ex post facto vio[lation.] "We have long held," the Court said, "that the question of what legislative adjustm[ents] will be held to be of sufficient moment to transgress the constitutional prohibitio[n must] be a matter of degree."  Id. at 1603 (internal quotations omitted) (emphasis added)[.]

Morales also highlights the flexibility of the punishment inquiry.  It ma[kes no] reference or citation to De Veau, Halper, Austin, or Kurth Ranch at all.  This coul[d be] read as a rejection of those standards in the ex post facto context, but we think t[he] better reading of this mere omission in Morales is that the appropriate "punishment[]" analysis depends on the context.  The Court said as much:  "[W]e have previously de[clined] to articulate a single 'formula' for identifying those legislative changes that hav[e a] sufficient effect on substantive crimes or punishments to fall within the constitut[ional] prohibition, and we have no occasion to do so here."  Id. (citation omitted).  Mora[les did] not need to discuss Austin and its progeny because the facts in Morales involved

----

[0]We discuss the benchmarks for evaluating the "matter of degree" infra page 69.

47

imprisonment; the Court needed only to discuss and distinguish the most on-point ca

Lindsey, Weaver, and Miller, supra.  And in doing so it looked at negative effects

Morales as "a matter of degree."  Id.

This examination of effects, like the Austin inquiry into history, is nec

to limit what would otherwise be the untenable results of the De Veau subjective pu

inquiry and the Halper means-end calculus.  While even a substantial "sting" will n

render a measure "punishment," see Halper, 490 U.S. at 447 n.7; Kurth Ranch, 114 S.

1945 n.14, at some level the "sting" will be so sharp that it can only be considere

punishment regardless of the legislators' subjective thoughts. For example, the

legislature, with the purest heart(s), could extend the prison sentences of all pre

convicted sex offenders for the sole reason of protecting potential future victims.

was simply not understood how dangerous they would be when released, the legislator

truthfully explain, and society would be safe only if sex offenders were kept behin

This remedial purpose would thus fully explain the continued incarceration; in the

terms of Halper, the continued imprisonment would be "rationally related" to the go

protecting vulnerable citizens.  But no Justice has ever voted to uphold a statute

retroactively increased the term of imprisonment for a past offense.  See Miller v.

Florida, 482 U.S. 423 (1987); Weaver v. Graham, 450 U.S. 24 (1981).

6.        Kennedy v. Mendoza-Martinez: The Inquiry for the Nature of Proceedings

Finally, before attempting a synthesis, we must briefly discuss the test

employed by the district court -- which was based on Kennedy v. Mendoza-Martinez, 3

48

144 (1963) -- and explain why we find its approach inappropriate.  In that case, th

held that divesting American citizenship for draft evasion or military desertion wa

"punishment" requiring the procedural protections of the Fifth and Sixth Amendments

"[T]he Fifth and Sixth Amendments mandate that this punishment cannot be imposed wi

prior criminal trial and all its incidents, including indictment, notice, confronta

jury trial, assistance of counsel, and compulsory process for obtaining witnesses.'

at 167 (emphasis added).

Mendoza-Martinez set forth a multi-factor analysis to determine whether a

measure constitutes "punishment" triggering criminal process guarantees:

> [1] whether the sanction involves an affirmative disability or
> restraint, [2] whether it has historically been regarded as punitive,
> [3] whether it comes into play only on a finding of scienter, [4]
> whether its operation will promote the traditional aims of punishment
> -- retribution and deterrence, [5] whether the burden to which it
> applies is already a crime, [6] whether an alternative purpose to
> which it may rationally be connected is assignable for it, [7] whether
> it appears excessive in relation to the alternative purpose.

Id. at 168-69.  The district court applied this test in holding that notification u

Megan's Law was unconstitutional.

However, Supreme Court has made clear that the Mendoza-Martinez test is r

controlling for the issues in this case. See Austin, 113 S. Ct. at 2806 n.6.  Altho

Mendoza-Martinez used the word "punishment," Austin explains that the seven factors

properly used to determine whether a proceeding is "so punitive that the proceeding

reasonably be considered criminal" for purposes of Sixth Amendment trial protection

"In addressing the separate question whether punishment is being imposed, the Court

not employed the tests articulated in Mendoza-Martinez and Ward."  Id.

49

Amicus American Civil Liberties Union (ACLU) makes a clever argument on t

point.  The Supreme Court has said that <u>Mendoza-Martinez</u> does not control for

determinations of whether a civil measure is "punishment."  The ACLU contends that

because the <u>Mendoza-Martinez</u> "test" -- which analyzes whether something is "so puni

as to invoke criminal trial protections -- is harder to prove than the test for mer

"punishment."  Logically, if a measure is "so punitive" to satisfy the higher <u>Mendo</u>

<u>Martinez</u> threshold, amicus argues, it should also be "punishment" for purposes of t

challenges Artway brings, even if the reverse is not true.

Nevertheless, like the New Jersey Supreme Court in <u>Doe</u>, 142 N.J. at 63-73

think it wise to heed the Supreme Court's advice:  <u>Mendoza-Martinez</u> is inapplicable

outside the context of determining whether a proceeding is sufficiently criminal in

to warrant criminal procedural protections of the Fifth and Sixth Amendments.[0]  <u>See</u>

---

[0]Although the New Jersey Supreme Court recognized in <u>Doe</u> that <u>Mendoza-Martinez</u> does
apply to this analysis, we disagree with that court's approach insofar as it failed
take this recognition to its logical conclusion (in addition to its neglect of hist
under <u>Austin</u> and its total disregard of effects).  The <u>Doe</u> Court notes that <u>Mendoza</u>
<u>Martinez</u> does not apply to the relevant "punishment" analysis, but continues to rel
other authorities that, like <u>Mendoza-Martinez</u>, pertain to the question of whether a
proceeding is sufficiently criminal in nature to warrant protection under the Fifth
Sixth Amendments.
        For example, although the <u>Doe</u> Court nominally applies the <u>Halper</u> and <u>Aust</u>
tests, it loads its analysis with the assertion that "[w]here the stated legislativ
intent is remedial, the burden on those claiming there is a hidden punitive intent
'clearest proof' of that intent."  <u>Doe</u>, 142 N.J. at 162 (citing <u>United States v. Wa</u>
U.S. 242, 248-49 (1980); <u>Flemming v. Nestor</u>, 363 U.S. 603, 617 (1960)).  <u>Ward</u>, like
<u>Mendoza-Martinez</u>, involves the different question whether a proceeding is effective
criminal so that the procedural protections of the Fifth and Sixth Amendments must
<u>Ward</u>, therefore, is as inapplicable to this analysis as <u>Mendoza-Martinez</u> itself.  A
<u>Flemming</u> was decided in the "actual purpose" era of <u>De Veau v. Braisted</u>, 363 U.S. 1
(1960) (decided the same year).  <u>Halper</u> has since made clear that "the labels 'crim
and 'civil' are not of paramount importance." 490 U.S. at 447.  <u>Austin</u>, <u>Kurth Ranch</u>

50

<u>Austin</u>, 113 S. Ct. at 2806 n.6. Even when the Court has recited the <u>Mendoza-Martine</u>

factors, including in <u>Mendoza-Martinez</u> itself, it has played them down. <u>See</u> <u>Mendoza</u>

<u>Martinez</u>, 372 U.S. at 167 (declining to apply its own factors).  It has consistentl

insisted that these factors, really a grab-bag of many individual tests, are neithe

controlling nor dispositive.  <u>See</u> <u>United States v. Ward</u>, 448 U.S. 242, 249 (1980)

list of considerations, while certainly <u>neither exhaustive nor dispositive</u>, has pr

helpful in our own consideration of similar questions and provides <u>some</u> guidance.")

(emphasis added).  Finally, we think that a seven factor balancing test -- with fa

unknown weight that "may often point in differing directions," <u>Mendoza-Martinez</u>, 37

at 169 -- is too indeterminate and unwieldy to provide much assistance to us here.

## B.  **Synthesizing the Jurisprudence: The Test(s)**

Synthesizing these cases, we derive the following analytical framework fo

case.  A measure must pass a three-prong analysis -- (1) actual purpose, (2) object

_____

<u>Morales</u> have further changed the analysis, sensibly we think, to include an increas
focus on objective, effect-oriented aspects of the measure in question.

The inapplicability of <u>Mendoza-Martinez</u> also refutes New Jersey's argumen
concerning <u>United States v. Salerno</u>, 481 U.S. 739 (1987).  New Jersey argues that <u>S</u>
establishes that even preventive detention does not offend the Ex Post Facto Clause
<u>Salerno</u> held that preventive detention, before a trial, was not pre-trial "punishme
violation of the Due Process Clause.  <u>Id.</u> at 755.  The Court reached this conclusio
through application of the <u>Mendoza-Martinez</u> test.  <u>Id.</u> at 747.  <u>Salerno</u>, therefore,
little light on the test that we must apply in the context of an ex post facto inqu
Even if we were to apply the <u>Kennedy v. Mendoza-Martinez</u> factors, they do not supp
determination that registration constitutes punishment.  Only one factor points tow
punishment: whether the burden applies to conduct that is already criminal. The oth
point toward non-punishment.  Even factor (3) --whether the burden is imposed only
proof of <u>scienter</u> (criminal intent) -- militates against a finding of "punishment"
registration because Megan's Law also applies to those judged not guilty by reason
insanity.  <u>See</u> N.J.S.A. 2C:7-2a.

51

purpose, and (3) effect -- to constitute non-punishment.  We must look at actual pu

to see "whether the legislative aim was to punish."  See De Veau, 363 U.S. at 160.

legislature intended Megan's Law to be "punishment," i.e., retribution was one of i

actual purposes, then it must fail constitutional scrutiny.  If, on the other hand,

restriction of the individual comes about as a relevant incident to a regulation,"

measure will pass this first prong.  Id.

If the legislature's actual purpose does not appear to be to punish, we l

next to its "objective" purpose.  This prong, in turn, has three subparts.  First,

law be explained solely by a remedial purpose?  See Halper, 490 U.S. at 448.  If no

is "punishment."  Second, even if some remedial purpose can fully explain the measu

does a historical analysis show that the measure has traditionally been regarded as

punishment?  See Austin, 113 S. Ct. at 2806.  If so, and if the text or legislative

history does not demonstrate that this measure is not punitive, it must be consider

"punishment." Third, if the legislature did not intend a law to be retributive but

intend it to serve some mixture of deterrent and salutary purposes, we must determi

whether historically the deterrent purpose of such a law is a necessary complement

salutary operation and (2) whether the measure under consideration operates in its

manner, consistent with its historically mixed purposes.  See Kurth Ranch, 114 S. C

1946-48.  Unless the partially deterrent measure meets both of these criteria, it i

"punishment."  If the measure meets both of these criteria and the deterrent purpos

not overwhelm the salutary purpose, it is permissible under Kurth Ranch.

Finally, if the purpose tests are satisfied, we must then turn to the eff

the measure.  If the negative repercussions -- regardless of how they are justified

52

great enough, the measure must be considered punishment.  See Morales, 115 S. Ct. a

This inquiry, guided by the facts of decided cases, is necessarily one "of degree."

id.

We have thus attempted to harmonize a body of doctrine that has caused mu

disagreement in the federal and state courts.  We realize, however, that our synthe

by no means perfect.  Only the Supreme Court knows where all the pieces belong.  Th

will, we hope, provide more guidance with its decision in United States v. $405,089

U.S. Currency, 33 F.3d 1210 (9th Cir. 1994), amended on denial of rehearing, 56 F.3

(1995), cert. granted, 116 S. Ct. 763 (1996), or some other case in the near future

this qualification in mind, we turn to the application of this test to Megan's Law.

## C.   The Registration Provisions of Megan's Law Evaluated

The registration provisions of Megan's Law are relatively simple.  They r

"repetitive and compulsive" sex offenders who have completed a sentence for designa

crimes to register with local law enforcement.  Because Artway meets these requirem

he must register if he returns to New Jersey.  In registering, Artway must provide

information including descriptions of his appearance, his genetic markers, and his

residence and work place to the chief law enforcement officer of the municipality i

he chooses to reside.  He must periodically confirm his residence and notify law

enforcement if he moves.  Unlike the notification provisions of Megan's Law --which

require notice of Artway's crime, his description, his whereabouts, and, critically

State's assessment of his future dangerousness to members of Artway's community --

53

registration provides this information only to law enforcement agencies.  The infor

is not open to public inspection.


1.          Actual Purpose

The first prong of our test asks whether the legislature's actual purpose

punish.  See De Veau, 363 U.S. at 160.  The only indication of actual legislative i

regarding the enacted version of Megan's Law is the following statement of purpose

legislation itself:

> 1. The Legislature finds and declares:
> a. The danger of recidivism posed by sex offenders and offenders who
> commit other predatory acts against children, and the dangers posed by
> persons who prey on others as a result of mental illness, require a
> system of registration that will permit law enforcement officials to
> identify and alert the public when necessary for the public safety.
>
> b. A system of registration of sex offenders and offenders who commit
>
> other predatory acts against children will provide law enforcement
>
> with additional information critical to preventing and promptly
>
> resolving incidents involving sexual abuse and missing persons.

N.J.S.A. 2C:7-1.  This passage suggests that the legislature's actual purpose was n

punishment.  It speaks of "identify[ing] and alert[ing] the public" to enhance safe

"preventing and promptly resolving incidents."  Protecting the public and preventin

crimes are the types of purposes De Veau found "regulatory" and not punitive.  363

160.

The only other legislative history, a statement in the bill as introduced

New Jersey Senate, buttresses the conclusion that the legislature's intent was not

54

punish. "The danger posed by the presence of a sex offender who has committed viol[ent] acts against children requires a system of notification to protect the public safet[y and] welfare of the community." Senate Bill No. 14 (introduced September 12, 1994). The[se] section literally speaks of "notification," but if the legislature's actual purpose [in] notification was remedial, it is hard to imagine that its purpose in the predicate [and] less harsh step of registration was punitive.

The circumstances of this enactment, which generated such sparse legislat[ive] history, gives us pause. Megan's Law was rushed to the floor as an extraordinary m[easure,] skipping committee consideration and debate entirely. It is just these "sudden and [strong] passions to which men are exposed" that the Framers designed the Ex Post Facto and [Bill of] Attainder Clauses to protect against. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 137 (1810). Nevertheless, the evidence we do have of actual legislative intent points [to a] non-punitive purpose.

2.        Objective Purpose

The objective purpose prong asks three related questions. First, we must [first] discern whether the law can be explained solely by a remedial purpose. See Halper, [490] U.S. at 448. Registration is a common and long-standing regulatory technique with [a] remedial purpose. See, e.g., New York v. Zimmerman, 278 U.S. 63 (1928) (registrati[on of] membership corporations and associations permissible); United States v. Kahriger, 3[45 U.S.] 22 (1953) (registration of professional gamblers permissible); United States v. Ha[rriss,]

55

347 U.S. 612 (1954) (registration of lobbyists permissible).[0]  One need look no fur

than the Selective Service to find a nonpunitive registration system for individual

<u>Gillette v. United States</u>, 401 U.S. 437 (1971) (sustaining selective service system

against claim that it violated free exercise).

Here, the solely remedial purpose of helping law enforcement agencies kee

on these offenders fully explains requiring certain sex offenders to register.

Registration may allow officers to prevent future crimes by intervening in dangerou

situations.  Like the agent who must endure the snow to fetch the soupmeat, the reg

may face some unpleasantness from having to register and update his registration.

remedial purpose of knowing the whereabouts of sex offenders fully explains the

registration provision just as the need for dinner fully explains the trip out into

night.  And the means chosen -- registration and law enforcement notification only

not excessive in any way.  Registration, therefore, is certainly "reasonably relate

legitimate goal:  allowing law enforcement to stay vigilant against possible re-abu

Second, we must consider history, and registration does not resemble puni

through a historical analysis.  Artway spends much of his brief chronicling the his

understanding of public shame as punishment.  "Early forms of punishment contained

elements of gross public humiliation. . . . Physical punishments . . . were carrie

publicly in ceremonial fashion [because it was] intended that the victim should be

humiliated, for degradation figured largely in all contemporary theories of punishm

---

[0]<u>Lambert v. California</u>, 355 U.S. 225 (1958), invalidated a registration statute, bu
the different reason that it gave no notice.  The registrant in that case did not b
the punishment-oriented claims that Artway makes, apparently because her facts woul
support the other predicates of those challenges (e.g., she committed her offense a
the enactment of that act).

Jon A. Brilliant, Note, <u>The Modern Day Scarlet Letter:  A Critical Analysis of Mode</u>

<u>Probation Conditions</u>, 1989 Duke L.J. 1357, 1360-61 (internal quotations omitted); <u>s</u>

<u>Ex Parte Wilson</u>, 114 U.S. 417, 428 (1885) (cataloguing "punishments that consist

principally in their ignominy" as set forth in Blackstone's Commentaries); <u>Crime an</u>

<u>Punishment in American History</u> 40 (explaining that humiliating punishments were

historically intended to serve as deterrents).

In particular, Artway argues that Megan's Law is analogous to that most f

badge of punishment:  the Scarlet Letter.  "There can be no outrage . . . against c

common nature,--whatever be the delinquencies of the individual,--no outrage more f

than to forbid the culprit to hide his face for shame; as it was the essence of thi

punishment to do." Nathaniel Hawthorne, <u>The Scarlet Letter</u> 63-64 (Random House 195C

(1850).  Like the Scarlet Letter, Artway contends, Megan's Law results in public os

and opprobrium:  it would subject him to potential vigilantism, impair his opportur

to work, and damage his abilities to develop and maintain stable relationships.  Ir

submission, its "remedial" purpose -- to protect the public from him -- seeks to br

as an outcast. Such a shunning by one's community is the essence of historical puni

Artway contends.

Artway's argument has considerable force, but the notification issue is r

before us.  We evaluate only registration, and that provision bears little resembla

the Scarlet Letter.  Registration simply requires Artway to provide a package of

information to local law enforcement; registration does not involve public notifica

Without this public element, Artway's analogy fails.  The Scarlet Letter and other

punishments of "shame" and "ignominy" rely on the disgrace of an individual before

community.  The act of registering with a discrete government entity, which is not

authorized to release that information to the community at large (except in emerger

cannot be compared to public humiliation.  The officers who constitute local law

enforcement, even if they are from Artway's area, would constitute only a de minimi

portion of that community.  And their ready access to criminal history information

integral part of their jobs, rather than an extraordinary event likely to trigger

opprobrium.

Artway relies on Weems v. United States, 217 U.S. 349 (1910), to establis

even registration is "punishment."  It does not aid his case.  Weems struck down as

and unusual punishment a Philippine law that imposed horrible punishments for

falsification of public documents.  Id. at 363.  Any false entry, even if unintenti

and with no ill effect, triggered the "cadenza temporal."  Id.  This punishment imp

hard and painful labor for a period from twelve years and a day to twenty years, sh

at the wrist and the ankle, with no access to family or loved ones, the extinguishm

civil rights while serving the sentence, perpetual disqualification from political

such as holding office, and "surveillance."  Id. at 363–64.

The Weems Court confronted a different issue from the one in this case.

Court held that this harsh punishment as a whole was cruel and unusual for the rela

minor offense involved.  Id. at 382.  And the "surveillance" statute that made up a

part of the total punishment differed from Megan's Law in at least one significant

respect:  the unfortunate offender in Weems was required to obtain written permissi

before he could move.  See id. at 363.  Given this larger context, the Court's dict

58

about the harshness of "surveillance" hardly establishes that registration is "punishment."

Finally, because registration historically is a regulatory technique with salutary purpose, any incidental purpose to deter future offenses by past sex offen[...] will not invalidate it under <u>Kurth Ranch</u>.

3.        <u>Effects</u>

The final prong examines whether the effects -- or "sting" -- of a measur[...] harsh "as a matter of degree" that it constitutes "punishment."  <u>See</u> <u>Morales</u>, 115 S[...] at 1603. The caselaw does not tell us where the line falls that divides permissible [...] impermissible effects, but we know the "matter of degree" is somewhere between imprisonment and revocation of citizenship on the one hand, and loss of a professi[...] benefits on the other.  <u>Compare</u> <u>Miller v. Florida</u>, 482 U.S. 423 (1987) (increased [...] incarceration is "punishment") and <u>Trop v. Dulles</u>, 356 U.S. 86 (1958) (revoking citizenship is "punishment") <u>with</u> <u>De Veau v. Braisted</u>, 363 U.S. 144 (1960) (forbid[...] work as union official not "punishment"); <u>Hawker v. New York</u>, 170 U.S. 189 (1898) (revoking medical license is not "punishment") and <u>Flemming v. Nestor</u>, 363 U.S. 603[...] (terminating social security benefits not "punishment").[0]

---

[0]Of course, insofar as <u>De Veau</u>, <u>Hawker</u>, and <u>Flemming</u> undertook only an actual purpo[...] test, they are methodologically incomplete compared with current law on "punishment[...] Nevertheless, because these cases have not been overruled, we must try to read them consistently with current law.  To do so, the measures challenged in these cases mu[...] survive the subsequent objective purpose and effect tests.  We presume, therefore, [...] these cases must provide benchmarks for permissible effect.

59

Artway marshals strong reasons that notification would have devastating e[...]
In addition to the ostracism that is part of its very design, notification subjects[...]
possible vigilante reprisals and loss of employment.  And unlike the mere fact of [...]
conviction, which might be learned from an employment questionnaire or public recor[...]
notification under Megan's Law features the State's determination -- based overwhel[...]
on past conduct -- that the prior offender is a <u>future</u> danger to the community.[0]  W[...]
reemphasize, however, that as forceful as Artway's arguments seem to be, the issue [...]
notification is not ripe at this time.

On the other hand, registration, the only phase of Megan's Law upon which[...]
pass judgment, has little impact. Most of the information is already available in t[...]
public record.  It is disclosed only to law enforcement, which has ready access to [...]
criminal history.  And, unlike notification, the information contains no assessment[...]
State that Artway is a future danger.  Therefore, this impact, even coupled with th[...]
registrant's inevitable kowtow to law enforcement officials, cannot be said to have[...]
effect so draconian that it constitutes "punishment" in any way approaching incarce[...]
It is less harsh than losing a profession or benefits.

While there doubtless are some unpleasant consequences of registration --[...]
possible that police will leak information or engage in official harassment -- we m[...]
presume that law enforcement will obey the law.  Moreover, Artway, who of course be[...]
burden of proof to invalidate a statute on constitutional grounds, presents no evid[...]
this record of dire consequences flowing from registration.

---

[0]Past criminal conduct is the basis of 90 of the possible 111 points in the Registr[...]
Risk Assessment Scale.

**D.  Summary of Registration Claims**

Analyzing the registration provisions of Megan's Law under the (1) actual

purpose, (2) objective purpose, and (3) effects prongs of our "punishment" test, we

conclude that registration under Megan's Law does not constitute "punishment" under

measure of the term.  Hence, it does not offend the Ex Post Facto, Double Jeopardy,

Bill of Attainder Clauses. Therefore, although our analysis differs from that empl

the district court and the Supreme Court of New Jersey, we agree with their conclus

regarding registration.

**VI.    EQUAL PROTECTION**

Turning to the remainder of Artway's claims, we begin by rejecting his ar

that Megan's Law violates equal protection.  Artway contends that Megan's Law's

distinction between "compulsive and repetitive" sex offenders and other sex offende

"arbitrary and discriminatory."  However, the Equal Protection Clause does not forb

discrimination, and the distinctions made by Megan's Law are not arbitrary.

The Equal Protection Clause provides that no state shall "deny to any per

within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV

This is not a command that all persons be treated alike but, rather, "a direction t

persons <u>similarly situated</u> should be treated alike."  <u>City of Cleburne, Tex. v. Cle</u>

<u>Living Center</u>, 473 U.S. 432, 439 (1985) (emphasis added).  The level of scrutiny ap

to ensure that classifications comply with this guarantee differs depending on the

of the classification. Classifications involving suspect or quasi-suspect class, or

61

impacting certain fundamental constitutional rights, are subject to heightened scru
Id. Other classifications, however, need only be rationally related to a legitimat
government goal. See Chapman v. United States, 500 U.S. 453, 465 (1991) (applying r
basis test to classification based on nature of offense).

Megan's Law requires persons who have committed their offense and complet
incarceration, probation and parole by the date the Law was enacted to register onl
they were found to be "repetitive and compulsive" at sentencing. The challenged ca
-- "repetitive and compulsive sex offenders" -- is not a suspect or quasi-suspect c
See Cleburne, 473 U.S. at 439 (listing classes receiving heightened scrutiny as rac
alienage, national origin, and sex). It also does not implicate a fundamental
constitutional right for which the Supreme Court has granted heightened equal prote
scrutiny. See Chapman v. United States, 500 U.S. at 465 (applying rational basis t
classification based on nature of offense). This classification, therefore, "is su
to the general rule that legislation is presumed to be valid and will be sustained
classification drawn by the statute is rationally related to a legitimate state int
Cleburne, 473 U.S. at 440 (citing cases).

Registration easily satisfies this requirement. Protecting vulnerable
individuals from sexual offenses is certainly a legitimate state interest. Requiri
registration of convicted sex offenders found to be "repetitive and compulsive," as
opposed to other sex offenders or the rest of the population, is rationally related
that goal. See, e.g., State v. Wingler, 25 N.J. 161, 176 (1957) (holding that
classification of repetitive and compulsive sex offenders "has a rational basis");
v. Lockhart, 826 F.2d 791, 794 (8th Cir. 1987) (applying rational basis test to hol

Arkansas statute excluding sex offenders from work/study release program for inmate[s]

not violate equal protection).  The legislature could have rationally concluded tha[t]

offenders who had completed all incarceration, probation and parole had a good chan[ce]

reintegrating into their communities and therefore posed a lower risk.  Also, reali[zing]

that people who had rejoined society had the most to lose, the legislature could ha[ve]

rationally decided to require only "repetitive and compulsive" offenders in this ca[tegory]

to register.  Thus, this classification does not offend equal protection.

Artway's reliance on Foucha v. Illinois, 504 U.S. 71 (1992), as establish[ing]

heightened scrutiny in this case is misplaced.  Foucha held that a state statute al[lowing]

continued confinement of an individual acquitted by reason of insanity, even when t[he]

person had ceased to be mentally ill, violated due process.  Id. at 78-83.  A plura[lity]

indicated that doing so was also an equal protection violation.  Id. at 84-85.  But

unlike Megan's Law, the statute in Foucha denied those subject to it of their physi[cal]

liberty, which the Court has recognized as a fundamental constitutional right trigg[ering]

heightened scrutiny. See United States v. Salerno, 481 U.S. 739, 750 (1987).[0]


## VII.   DUE PROCESS

We also reject Artway's contention that Megan's Law denies due process by

classifying former offenders on the basis of "repetitive and compulsive behavior." [This]

argument has two subparts.  First, Artway argues that requiring him to register on [the]

---

[0] Moreover, the heightened scrutiny the plurality hints at --"the State must have a [
particularly convincing reason," id. at 85 -- was probably unnecessary to decide th[e equal]
protection issue: The classification of insanity acquittees was so underinclusive t[hat it]
was not even rational.

63

basis of the "repetitive and compulsive" finding violates due process because the f

was unreliable when made.  The supposed unreliability stems from an alleged lack of

training of the State employees making these determinations.  Second, he contends,

him accountable for this determination violates due process because he did not have

at the time of sentencing of the negative implications of this finding.  Artway adm

that he was advised of his right to contest the "repetitive and compulsive" finding

contends that such a finding was in his interest because it was his only hope for

obtaining treatment and being placed in a treatment center, safe from the general p

population.

Although he does not spell out why using the "repetitive and compulsive"

against him would amount to a due process deprivation, we will assume he means that

actions would be "fundamentally unfair."  Cf. Daniel v. Williams, 474 U.S. 327, 341

(Stevens, J., concurring) ("Petitioners must show that [the state procedures] conta

defect so serious that we can characterize the procedures as fundamentally unfair,

defect so basic that we are forced to conclude that the deprivation occurred withou

process.").

But even this argument has no merit.  We need not reach the issue of the

fairness -- whether because of unreliability or lack of incentive to oppose -- of t

"repetitive and compulsive" finding.  One must have an interest in life, liberty, o

property before due process protections are triggered.  U.S. Const. amend. IV, § 1;

also Goldberg v. Kelly, 397 U.S. 254 (1970).  Artway has no such interest in the

reputational damage, if any, that accompanies registration.  See Doe, 142 N.J. at 1

Paul v. Davis, 424 U.S. 693, 701 (holding mere damage to reputation insufficient to

64

trigger due process); <u>Sturm v. Clark</u>, 835 F.2d 1009, 1012 (3d Cir. 1987) (holding h

reputation and financial interests insufficient to confer liberty interest). And at

stage, the "repetitive and compulsive" finding subjects him to no more than registr

Artway may have a liberty interest in <u>notification</u> under state law trigge

federal due process protections. <u>See</u> <u>Doe</u>, 142 N.J. at 103-106. But, as explained

Part IV, his challenges to notification are not yet ripe.

## VIII. UNCONSTITUTIONAL VAGUENESS

Artway next argues that Megan's Law is unconstitutionally vague because i

forces him to "guess" whether he is covered by the Act. We disagree. Due process

requires only that a penal statute give persons of "common intelligence" fair notic

"what the State commands or forbids." <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453 (1

While Artway appears to style his complaint as a facial challenge, he has standing

raise the vagueness of the Act as it applies to him unless he can prove that the Ac

vague in substantially all its applications. <u>See</u> <u>Village of Hoffman Estates v. Fli</u>

<u>Hoffman Estates, Inc.</u>, 455 U.S. 489, 494-95 (1982); <u>United States v. Powell</u>, 423 U.

92 (1975). Because Artway does not, and cannot, establish that Megan's Law is vagu

---

[0]We express no opinion regarding whether Artway may be able to challenge his "repet
and compulsive" finding at a notification hearing if, in fact, he is ever slated fo
notification. We also express no opinion about whether Artway may be able to avoid
registration, on a basis other than due process, if he can prove that the "repetiti
compulsive" finding was <u>never</u> valid. Finally, we do not opine on the related questi
which is not now posed by Artway in these terms -- whether he may on some theory be
to avoid (or to terminate the need for) registration if he can prove that the origi
"repetitive and compulsive" finding no longer has any current validity.

substantially all its applications, we deal only with the provisions of Megan's Law

they apply to him.[0]

Under the relevant section of Megan's Law, a person who has been convicte

"sex offense" must register.  Paragraph (1) of that section defines "sex offense" t

include "aggravated sexual assault, sexual assault . . . if the court found that th

offender's conduct was characterized by a pattern of repetitive and compulsive beha

Paragraph (3) of that section further defines "sex offense" to include "<u>a sentence</u>

basis of criteria similar to the criteria set forth in paragraph (1) . . . entered

imposed under the laws of the United States, this state or another state."  N.J. St

Ann. 2c:7-1b. (emphasis added).

The crux of Artway's argument is that the "sentenced on the basis of crit

similar to" language violates due process by not specifying the predicate crimes mo

clearly.  But Artway's duty to register is patent under the Act.  Megan's Law requi

registration for those sentenced under "similar criteria" to "aggravated sexual ass

sexual assault . . . if the court found that the offender's conduct was characteriz

pattern of repetitive and compulsive behavior."  N.J. Stat. Ann. 2c:7-1b.  Thus, Ar

must register if he was sentenced for engaging in (1) "sexual assault" and (2) "rep

and compulsive" behavior.

---

[0]We also decline to address Artway's argument, made in his brief to this Court, tha
Megan's Law does not apply to him as a matter of New Jersey law.  We almost certain
cannot grant Artway's requested relief -- an injunction against state officials fro
enforcing this law -- on this basis.  <u>See</u> <u>Pennhurst State Sch. and Hosp. v. Halderm</u>
U.S. 89 (1984) (holding that the Eleventh Amendment bars federal courts from enjoin
state officials from violating state law).  Moreover, confronted with the <u>Pennhurst</u>
problem, Artway has disclaimed this claim for relief, going so far as to insist at
argument and in a subsequent letter memorandum that it was never his intention to s
such relief from this Court.

66

Artway argues (in so many words) that, because the crime of sodomy did no[t] require an element of violence at the time he was convicted, it is unclear whether [it] falls under the "sexual assault" requirement. The statutory elements of the crime, however, are a red herring. Artway was <u>sentenced</u> under New Jersey's prior sex offe[nse] law, which required a finding of both "violence" and "repetitive and compulsive beh[avior]." In particular, the sentencing judge made a finding at sentencing that Artway used v[iolence] to perpetrate a sexual act. See <u>Artway v. Pallone</u>, 672 F.2d 1168, 1170-71 & n.3 (3[d Cir.] 1982) (describing crime). This is plainly sexual assault. The sentencing judge al[so] found that Artway had engaged in "repetitive and compulsive" behavior. <u>See</u> <u>id.</u> Th[us,] Artway received "a sentence on the basis of criteria" similar to both elements of paragraph (1). Because the statute facially applies to Artway, he could reasonabl[y be on notice] of his duty to register.

Artway's citation to <u>Hluchan v. Fauver</u>, 482 F. Supp. 1155 (D.N.J. 1980), [is of] no avail. Even if we found the reasoning of <u>Fauver</u> persuasive, it is inapposite. [That] case involved an equal protection challenge to regulations that classified prisoner[s for the] purpose of minimum custody eligibility. <u>Id.</u> at 1156. The rationality of the open-e[nded] regulations was at issue, not the fair notice question of this vagueness claim (a d[ue] process challenge). Moreover, the regulation in <u>Fauver</u> was objectionable for three reasons not present in this case. First, unlike Megan's Law, the <u>Fauver</u> regulation[s] initially left "sex offense" completely undefined (thus undermining its rationality[). Id.] at 1157. Second, the regulations contained a provision not present in Megan's Law [for] which the court was unable to "determine the meaning." <u>Id.</u> Finally, the incorpora[tion of] "sex offenses" from other states presented an equal protection problem, the court t[hought.]

67

because "the danger exists that individuals convicted of the same criminal conduct

different jurisdictions will be treated differently." Id. We doubt the soundness

finding equal protection violations on the basis of "dangers" that have not come to

but, in any event, Artway was convicted under the laws of the State of New Jersey a

faces no problem with the applicability of laws of other states.

## IX.    **PULLMAN ABSTENTION**

Finally, we conclude that the district court did not err in refusing to a

under Railroad Commission v. Pullman, 312 U.S. 496 (1941). Pullman abstention allo

federal courts, in rare cases, to abstain from deciding a case if a state court's

resolution of a state law issue would obviate the need for the federal court to rea

federal constitutional issue. The doctrine attempts to avoid constitutional questi

promote principles of federalism. However, Pullman abstention "is an extraordinary

narrow exception to the duty of a District Court to adjudicate a controversy proper

before it [which] can be justified . . . only in exceptional circumstances." Color

River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976) (quoting

Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 188–89 (1959)).

Under our jurisprudence, a district court must make three findings in ord

justify the Pullman exception to the general rule that federal courts must hear cas

properly brought within their jurisdiction. The Court must find (1) that uncertai

of state law underlie the federal constitutional claims brought in the district cou

that the state law issues are amenable to a state court interpretation that would o

the need for, or substantially narrow, adjudication of the federal claim; and (3) t

68

important state policies would be disrupted through a federal court's erroneous

construction of state law.  See Chez Sez III Corp. v. Township of Union, 945 F.2d 6

(3d Cir. 1991).  If all three factors are present, the federal court must then cons

whether abstention is appropriate by weighing such factors as the availability of a

adequate state remedy, the length of time the litigation has been pending, and the

of delay on the litigants.  Id. at 633.

Abstention is not warranted here.  First, although a state law issue -- w

Megan's Law applies to him --underlies the federal constitutional claim, this issue

"uncertain" because Megan's Law clearly applies to him.  See Part VIII supra.  Seco

because the applicability of Megan's Law to Artway is patent, this issue is not "am

to a state law determination that would obviate the need for a federal constitution

determination.  The Supreme Court has used various formulations to describe

"amenability,"[0] but no matter which we adopt, the lack of uncertainty about the sta

issue precludes satisfaction of this prong: a certain issue is not "amenable" to a

contrary interpretation.  The third factor --whether an improper interpretation of

law would disrupt important state policies -- favors the state because the scope of

Megan's Law is an important state issue.[0]  Nevertheless, two of the three essential

---

[0]See Biegenwald v. Fauver, 882 F.2d 748, 752 n.3 (quoting 17A Charles A. Wright et
Federal Practice and Procedure § 4242, at 42-44 (1988)).  A leading commentator has
interpreted the Supreme Court's typical formulation of amenability -- that the law
"fairly subject" to a state court interpretation eliminating the constitutional iss
as establishing a fairly high threshold requiring a "substantial possibility" that
interpretation would obviate the need for a federal constitutional decision. Erwin
Chemerinsky, Federal Jurisdiction 692-93 (1994).

[0]This Court reviews district court decisions on this factor under an abuse of discr
standard if they are "adequately explained."  See Hughes v. Lipscher, 906 F.2d 961,
(3d Cir. 1990).  Here, the district court provided no explanation about why signifi
state policies would not be interfered with by an erroneous decision about the scop

69

factors for abstention are lacking even before we come to the weighing factors; her Pullman abstention is inappropriate.

## X.    CONCLUSION

For the foregoing reasons, we hold that the lion's share of Artway's clai unripe.  In particular, we will dismiss as unripe Artway's claims (1) that the notification provisions of Megan's Law violate the Ex Post Facto, Bill of Attainder Double Jeopardy Clauses of the U.S. Constitution; and (2) that the State must provi Artway more process for receiving notice of and challenging the notification determination.  We also hold unripe the claim of the Chief of Police of Woodbridge Township that state immunity bars his "potential liability" for a hypothetical § 19 action seeking damages.

With regard to Artway's claims that are currently justiciable, we hold th the registration component of Megan's Law does not violate the Ex Post Facto, Doubl Jeopardy or Bill of Attainder Clauses as impermissible "punishment"; (2) the "repet and compulsive" classification of Megan's Law does not offend equal protection; (3) alleged unreliability and unfairness of Artway's "repetitive and compulsive" determ does not violate due process; and (4) Megan's Law is not unconstitutionally vague a

---

Megan's Law.  See Artway v. Attorney General, 876 F. Supp. 666, 670 n.4 (D.N.J. 199 concluded simply that because Artway "is facing a criminal penalty if he does not r today . . . [,] any argument for abstention obviously fails."  Id.  Thus, the distr court appears to have skipped straight to the discretionary balancing of hardships. agree that the equities favor Artway, but this weighing is necessary -- and appropr only if the three requirements for abstention are met.

70

applied to him.  Finally, we hold that the district court did not err in refusing t

abstain under <u>Pullman</u>.

The judgment of the district court will be vacated insofar as it enjoins

enforcement of Tier 2 and Tier 3 notification under Megan's Law, and affirmed insof

it holds the registration provisions (including Tier 1) of the Law constitutional.

parties shall bear their own costs.

SHADUR, Senior District Judge, concurring:

At the outset I should emphasize that this brief concurrence reflects no

disagreement with the results that have been announced in Judge Becker's detailed a

masterful treatment of the enormously complex subject matter that we have been call

to deal with here.  To the contrary, both the ultimate resolution of each substanti

issue posed by the record before us and (with the limited exception set out here) t

reasoning by which those results have been reached are the subject of our panel's

unanimous agreement.  Instead I write only to express the view (which is dealt with

somewhat different form in n.16 of the majority opinion) that United States v. Halp

not play the precise role that the majority's exposition suggests in analyzing the

of "punishment."

This is not at all a matter of "[c]abining Halper to monetary penalties,'

n.24 of the majority opinion describes the First Circuit's recent opinion in Unite

v. Stoller. Any efforts of the lower courts in the federal system to interpret the

sometimes Delphic pronouncements from the Supreme Court can on occasion resemble (t

metaphors) the divination of entrails.  When two such able and respected judges as

Becker and the First Circuit's Judge Bruce Selya come to such differing conclusions

the meaning and significance of a single Supreme Court opinion in the type of synth

that each of them has attempted in the course of defining "punishment" for double j

purposes, that very difference creates a strong implication that the oracular messa

the ultimate authority ranks high in the scale of obscurity.  With some trepidation

should like to add a few comments in a further effort to explicate Halper.

72

It is worth repeating the two consecutive sentences in <u>Halper</u>, 490 U.S. a

49 (citation omitted) that have the puzzling appearance of looking in opposite dire

based on their seemingly odd usage and placement of the word "only" in each of the

sentences:

> From these premises, it follows that a civil sanction that cannot fairly be sa
> solely to serve a remedial purpose, but rather can <u>only</u> be explained as also
> serving either retributive or deterrent purposes, is punishment, as we have co
> to understand the term.  We therefore hold that under the Double Jeopardy Clau
> a defendant who already has been punished in a criminal prosecution may not be
> subjected to an additional civil sanction <u>to the extent that</u> the second sancti
> may not fairly be characterized as remedial, but <u>only</u> as a deterrent or
> retribution.

In surface terms that usage appears to leave a gap, a no-man's land, with the first

sentences saying that a civil sanction is punitive (and is hence outlawed on double

jeopardy principles) <u>unless</u> it serves <u>only</u> a remedial purpose, and the second sayin

a civil sanction is impermissible for double jeopardy purposes solely to the extent

it serves <u>only</u> deterrent or retributive functions rather than being remedial. But I

with the majority's n.16 that those sentences can be reconciled--though to me the c

element of that reconciliation is in the phrase "to the extent that," which I have

therefore also underscored for emphasis.  Although the difference may be subtle, it

believe significant.  Let me amplify.

In the process of synthesizing <u>Halper</u> and <u>Kurth Ranch</u> (which I agree represent

proper approach), it seems to me to be critical to recognize the context in which t

<u>Halper</u> court spoke.  As already stated, <u>Halper</u> did deal with a monetary penalty.  A

that is not of course a basis for restricting the case's significance solely to suc

monetary types of "punishment" or non-"punishment," it does help to explain the

significance of the "to the extent" language in the earlier-quoted excerpt from Hal

If for example a $100,000 forfeiture of property of a previously-convicted defendan

imposed, one "that does not remotely approximate the Government's damages and actua

costs, [so that] rough justice becomes clear injustice" (Halper, 490 US. at 446), i

afoul of the Double Jeopardy Clause precisely because of that excessiveness.  That

such excessiveness triggers the Halper language that double jeopardy is involved "t

extent that the second sanction may not fairly be characterized as remedial, but or

deterrent or retribution" (id. at 449).

Just so with Judge Becker's soupmeat analogy.  If a previously-convicted defer

sent out for soupmeat armed with appropriate protection against the elements (snow

cold), no double jeopardy concerns are implicated.  But the answer is different whe

circumstances are changed to include the unjustified deprivation of warm clothing a

boots.  Why? Because the previously-convicted person "may not be subjected to [that

additional civil sanction to the extent that the second sanction may not fairly be

characterized as remedial, but only as a deterrent or retribution" (id.).

Where I believe the majority analysis presents difficulties is not in the area

monetary sanctions or in the hypothetical situation in which a sanction may be carv

(like soupmeat?) into discrete elements, but in extending that approach to situatio

which the second sanction does not lend itself to such a convenient parsing out or

splitting (in the manner that is true both of a monetary penalty, part of which can

labeled as remedial and part of which may exceed what is needed for remedial purpos

of the soupmeat example, which can also readily be separated into different compone

the sanction).  It is in that respect that I respectfully suggest that the first qu

2

sentence from <u>Halper</u> cannot be isolated from the next one--that <u>Halper</u> should not b

perceived as a pronouncement that as to <u>every</u> type of sanction, "punishment" (with

potential effect for double jeopardy purposes) is involved unless the sanction can

explained entirely without ascribing to it some retributive or deterrent component.

> As the majority opinion correctly says at page 65:
> Here, the solely remedial purpose of helping law enforcement agencies keep tab
> on these offenders fully explains requiring certain sex offenders to register.

And it is equally correct to say that this "solely remedial" characterization is no

altered by the fact that Artway may legitimately perceive registration as imposing

deterrent or retributive consequences on him (as <u>Halper</u> itself states, 490 U.S. at

n.7, "On the contrary, our cases have acknowledged that for the defendant even reme

sanctions carry the sting of punishment").

But having said all of this, I again stress that it is unnecessary to our unan

conclusion about the validity of the registration provisions of Megan's Law--a conc

that follows from the just-stated determination that those provisions are purely

remedial--to go on to decide what our conclusion would have been if we had determin

they were partially retributive or deterrent as well.  It is worth remembering that

itself contained a caveat against universalizing the rule that it announced.  Here

it said later down the page from the language quoted both by the majority opinion a

this concurrence (490 U.S. at 449-50):

> What we announce now is a rule for the rare case, the case such as the one
> before us, where a fixed-penalty provision subjects a prolific but small-gauge
> offender to a sanction overwhelmingly disproportionate to the damages he has
> caused.  The rule is one of reason: Where a defendant previously has sustained
> criminal penalty and the civil penalty sought in the subsequent proceeding bea
> no rational relation to the goal of compensating the Government for its loss,
> but rather appears to qualify as "punishment" in the plain meaning of the word

3

then the defendant is entitled to an accounting of the Government's damages an[d] costs to determine if the penalty sought in fact constitutes a second punishment.

On the other hand, I certainly agree with the majority that <u>Halper</u> contribut[ed] importantly to the total analysis, both by its acknowledgement that "civil" penalti[es] constitute punishment (<u>id</u>. at 447-48) and by adding the concept of objective inquir[y] that analysis (<u>id</u>. at 447). So this concurrence concludes as it began, with a tota[l] joinder in the conclusions reached in Judge Becker's fine opinion for the majority, [but] with a departure from that opinion's reasoning only in terms of voicing a suggested caveat--a caution against ascribing an excessive degree of importance to one portio[n of] the language quoted from <u>Halper</u> in the effort to forge a total synthesis of the Sup[reme] Court's jurisprudence for all future double jeopardy analyses.